******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# UNITED CONCRETE PRODUCTS, INC. *v.* NJR CONSTRUCTION, LLC, ET AL.
## (AC 42244)

Moll, Devlin and Flynn, Js.

*Syllabus*

The plaintiff subcontractor sought to recover damages for, inter alia, the breach of a contract it had entered into with the defendant N Co., the general contractor on a bridge construction project, which required the plaintiff to provide various concrete elements, including beams that would form the deck of the bridge. N Co. had contracted with the Department of Transportation to replace a bridge on Route 74 by August 31, 2016. To complete the work, N Co. was to detour traffic for no longer than eight weeks. The contract further specified that N Co. could earn incentive payments for each day Route 74 was reopened prior to the expiration of the eight week period. N Co. triggered the eight week period when it closed the bridge on June 13, 2016, which thereby required that Route 74 be reopened by August 8, 2016. To receive the maximum incentive payment, N Co. had to reopen Route 74 on or before July 19, 2016. Pursuant to statute (§ 49-41), N Co., as principal, also obtained from the defendant A Co., as surety, a bond that secured payment for labor and materials on the project, and made N Co. and A Co. jointly and severally liable for any unpaid balance on the subcontract. The plaintiff was required under the subcontract to deliver the concrete elements to N Co. at the jobsite on or before June 7, 2016, and N Co. was to pay the plaintiff the contract price. Relying on information the plaintiff provided about its production of the beams, N Co. scheduled delivery of the beams for June 29, 2016. On June 27, 2016, the plaintiff informed N Co. that the beams would not be ready for delivery as scheduled. The beams were thereafter delivered on July 26, 2016, and the project was completed on August 31, 2016. N Co. thereafter remitted partial payment to the plaintiff under the subcontract and refused to pay the remaining balance. In its complaint, the plaintiff alleged that N Co. breached the subcontract by failing to pay the remaining balance, and sought attorney's fees and interest pursuant to statute (§ 49-41a (c)). The plaintiff also sought payment from A Co. under the bond pursuant to statute (§ 49-42). N Co. filed a two count counterclaim, alleging that the plaintiff breached the subcontract as a result of the delayed delivery of the beams and engaged in unfair trade practices in violation of the Connecticut Unfair Trade Practices Act (§ 42-110a et seq.). The trial court rendered judgment for the plaintiff on its breach of contract claim against N Co. The court found that the plaintiff was entitled to recover the contract amount because N Co. had ultimately accepted the beams. The court denied the plaintiff's claim under § 49-41a (c) for attorney's fees and interest from N Co., as well as its claim against A Co. for payment on the bond under § 49-42. The court reasoned that those claims were barred because the plaintiff materially breached the subcontract by virtue of its delayed delivery of the beams. The court also found that N Co. was entitled to damages and attorney's fees on its breach of contract counterclaim. It further determined that the plaintiff had not proven that N Co. failed to mitigate its damages. The court also determined that the plaintiff's false and misleading statements with respect to the readiness of the beams and the timing of their delivery constituted a violation of CUTPA. On the plaintiff's appeal to this court, *held*:

1. The plaintiff could not prevail on its claim that the trial court's use of the June 7, 2016 delivery date to calculate N Co.'s damages on its breach of contract counterclaim was clearly erroneous; under the court's timeline, using June 7, 2016, as a start date, and combined with a thirty-six day period of completion pursuant to a nonaccelerated work pace, when construed as a worst case scenario, N Co. would have earned the maximum incentive payment by reopening Route 74 on or before July 19, 2016, as the court determined that N Co. was on track to earn the maximum incentive payment when it scheduled delivery on June 29,

2016, and was working at an accelerated pace at that time; moreover, the court determined, even if N Co. had worked at a nonaccelerated pace and had endured delays in rescheduling subcontractors and equipment rental, it would have reopened Route 74 by July 13, 2016, at the latest, had the beams been delivered on time; furthermore, as the beams necessarily were to be ready for delivery on or before June 7, 2016, to coincide with commencement of the road closure, the June 29, 2016 scheduled delivery date did not alter the plaintiff's contractual obligation to have the beams ready and available by June 7.

2. Contrary to the plaintiff's claim that the trial court improperly declined to find that N Co. failed to mitigate its damages by failing to work on the project at an accelerated pace once the beams were delivered, the record supported the court's finding that N Co. acted reasonably following delivery of the beams; N Co. already had lost the opportunity to earn any incentive payment and could not recover the expense of accelerating the work, it had lost its subcontractors in terms of when they would be able to come back to the project, and the acceleration costs would have caused N Co. to sustain significant losses that may have been passed on to the plaintiff.

3. The trial court erred in rendering judgment for A Co. on the plaintiff's payment bond claim, which was based on the court's determination that the plaintiff could not prevail on its claim for interest and attorney's fees under § 49-41a (c): no language in the payment bond or in §§ 49-41a or 49-42 prevented A Co. from being held jointly and severally liable for the amount that N Co. was liable, even though the court did not award the plaintiff interest and attorney's fees pursuant to § 49-41a (c) against N Co., the court, in analyzing the plaintiff's claims against both defendants under § 49-41a while making no mention of § 49-42, effectively made A Co.'s liability under § 49-42 dependent on the plaintiff's succeeding against N Co. under § 49-41a; moreover, although the express terms of the payment bond made A Co. jointly and severally liable with N Co., the court concluded that N Co. was liable for the unpaid contract price, and, in the absence of N Co.'s having made payment for all materials and labor used or employed, A Co.'s obligation remained in full force and effect; accordingly, the judgment was reversed as to the plaintiff's payment bond claim, and the case was remanded for a new trial on that claim.

4. This court declined to address the plaintiff's claim, which was raised for the first time on appeal, that the trial court erred by failing to award it attorney's fees and interest pursuant to § 49-41a (c) on the ground that it did not substantially perform under the subcontract; the plaintiff failed to raise at trial its assertion that, because the court failed to recognize that N Co. had implicitly waived the subcontract's time is of the essence provision, the plaintiff was not contractually required to deliver the beams by June 7, 2016, and, thus, substantially performed by delivering the beams on July 26, 2016.

5. The plaintiff's claim that the trial court incorrectly concluded that its actions constituted unfair trade practices was unavailing: contrary to the plaintiff's contention that it merely breached the subcontract, and that there was no evidence of aggravating circumstances or that its statements were made with ill intent, the record supported the court's factual findings that the plaintiff's unfounded assurances that beam fabrication was progressing on schedule, and, later, that the beams were fabricated and available so that a delivery date could be scheduled, constituted prevarications that were clearly immoral, unethical, and/or unscrupulous; moreover, the plaintiff's false information deterred N Co. from taking remedial action and caused it to incur additional expense by leading it into making unnecessary and/or premature plans and expenditures for labor allocation, equipment procurement and an inutile construction schedule.

6. The trial court's award of attorney's fees and expenses to N Co. was not erroneous in light of the court's finding that the plaintiff failed to supply the beams with promptness and diligence, the subcontract having expressly stated that N Co. had the right to recover attorney's fees and other expenses it incurred as a result of that failure.

Argued January 15, 2020—officially released September 21, 2021

*Procedural History*

Action to recover damages for, inter alia, the named

defendant's alleged breach of a construction contract, and for other relief, brought to the Superior Court in the judicial district of Tolland, where the named defendant filed a counterclaim; thereafter, the case was tried to the court, *Sferrazza, J.*; subsequently, the plaintiff withdrew the complaint in part as to the defendant Aegis Security Insurance Company; judgment in part for the plaintiff on the complaint and for the named defendant on the counterclaim, from which the plaintiff appealed to this court. *Reversed in part*; *further proceedings*.

*Eric M. Grant*, with whom, on the brief, was *Melissa A. Scozzafava*, for the appellant (plaintiff).

*Robert J. O'Brien*, with whom was *Andrea L. Gomes*, for the appellees (defendants).

*Opinion*

MOLL, J. This appeal arises out of the delayed construction of a bridge over the Hockanum River on Route 74 in Vernon. The plaintiff subcontractor, United Concrete Products, Inc., appeals from the judgment of the trial court, rendered as to certain claims in favor of the defendants, NJR Construction, LLC (NJR), as general contractor, and Aegis Security Insurance Company (Aegis), as surety.[1] On appeal, the plaintiff claims that the trial court improperly: (1) calculated its award of damages to NJR on the breach of contract count of NJR's counterclaim; (2) concluded that NJR did not fail to mitigate its damages; (3) failed to render judgment against Aegis on the plaintiff's payment bond claim and award interest and attorney's fees pursuant to General Statutes § 49-42; (4) failed to render judgment against NJR on the plaintiff's claim for interest and attorney's fees pursuant to General Statutes § 49-41a; (5) concluded that the plaintiff's conduct violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; and (6) awarded attorney's fees to NJR pursuant to the parties' purchase order agreement. Addressing these various contentions, we agree with the plaintiff's third claim and reverse the judgment of the trial court only with respect to count three of the complaint. We affirm the judgment in all other respects.

The following facts, as found by the trial court or as undisputed in the record, are relevant to our resolution of this appeal. On December 14, 2015, the Department of Transportation (department) contracted with NJR to replace a bridge over the Hockanum River on Route 74 in Vernon for a contract amount of $1,982,181 (contract).[2] On February 3, 2016, NJR and the plaintiff signed a purchase order for certain concrete elements that would be used to construct the bridge (subcontract).[3] Pursuant to the subcontract, the plaintiff was to provide NJR with various concrete elements, including ten prestressed deck beams. The beams measured approximately four feet wide, one and three-quarters feet tall, and forty-six feet long, and would form the deck of the bridge. NJR agreed to pay the plaintiff a total of $244,672.50. The subcontract further provided that the concrete elements were to be delivered at the jobsite "on or before June 7, 2016," and included a provision that time was of the essence.[4]

NJR's contract with the department specified that the project was to be completed within 161 days and that the failure to do so would cause NJR to incur liquidated damages in the amount of $2000 per day for every day that completion was delayed thereafter. The contract further contained incentive and disincentive provisions. In order to complete the replacement of the bridge, NJR was to detour the traffic on Route 74 for a period lasting no longer than eight weeks. The eight week time frame began when NJR closed the bridge

and the detour took effect. In order to incentivize NJR to open the road as promptly as possible, the contract specified that NJR could earn incentive payments in the amount of $3000 per day for each day Route 74 was reopened prior to the expiration of the eight week period, with a maximum total incentive payment of $60,000. Conversely, if NJR failed to open the road at the conclusion of the eight week detour period, it would incur a disincentive penalty in the amount of $3000 per day for every day that it exceeded that time frame. Therefore, in order for NJR to receive the maximum incentive payment of $60,000, it would have had to reopen Route 74 to traffic following the replacement of the bridge at least twenty days prior to the expiration of the eight week period.

The department approved NJR's March 24, 2016 base-line schedule for the project, as required by the contract, which provided an itemized description of the work that was to take place over the course of the 161 day construction period, through August 31, 2016.[5] NJR was incentivized to complete the bridge work ahead of that deadline. NJR triggered the eight week detour period when it closed the bridge to traffic on June 13, 2016, thereby requiring a reopening of Route 74 by August 8, 2016. Accordingly, pursuant to the incentive provision of the contract with the department, NJR would receive the entire $60,000 payment if it were to reopen Route 74 at least twenty days before August 8, 2016, i.e., on or before July 19, 2016.

NJR believed the project would be completed sufficiently in advance of the August 8 date, such that NJR would earn the maximum $60,000 incentive payment. That finding was supported by the following evidence. In March, 2016, the plaintiff had indicated that it was ready to commence production of the beams.[6] On May 5, 2016, Ryan Giguiere, NJR's project manager, e-mailed Joe Tenedine, the plaintiff's vice president of production, to inquire about the "pour schedule." Tenedine responded that "[t]he prestress will be complete by [May 27] if all strip strengths are met each day."[7] On the basis of that information, Giguiere scheduled delivery of the beams for June 29, 2016.

On or about June 13, 2016, the date on which NJR closed Route 74, Giguiere had a telephone conversation with Chris Borkowski, the plaintiff's sales representative, who assured Giguiere that the beams were ready for a so-called dry fit test. As of that date, however, the beams had yet to be poured. On June 27, 2016, two days before the scheduled delivery, Giguiere received a telephone call from Brian McCutcheon, the plaintiff's dispatcher, who relayed to Giguiere that none of the ten beams would be ready for delivery on June 29, 2016. In response to this development, NJR obtained an emergency meeting with the department, which was attended by both Tenedine and Borkowski on behalf

of the plaintiff. As it turned out, the first three beams cast by the plaintiff, on June 21, 25 and 28, 2016, respectively, failed state inspection and had to be recast—information that NJR claimed was not provided until the emergency meeting. On July 26, 2016, the plaintiff delivered the beams to the jobsite. The project was ultimately completed on August 31, 2016. The court concluded that the delay in delivering the beams caused NJR to lose the full amount of its potential incentive payment, to incur an adjusted disincentive penalty of $64,205,[8] incur additional expenses for the rescheduling of subcontractors and the rental of equipment, and to complete the project on August 31, well behind its proposed schedule. NJR remitted $66,074.75 under the subcontract to the plaintiff in November, 2016, and then refused to pay the remaining balance.

The plaintiff thereafter commenced this action against the defendants on February 6, 2017, by way of a four count complaint. Against NJR, the plaintiff asserted one count of breach of contract for NJR's alleged failure to pay the remaining balance of $179,500 on the subcontract (count one), and one count seeking attorney's fees and interest pursuant to § 49-41a (c) (count two). With respect to Aegis, the plaintiff asserted one count alleging entitlement to payment under the payment bond issued by Aegis on behalf of NJR, as principal, pursuant to § 49-42 (count three), and one count of breach of the covenant of good faith and fair dealing contained in the payment bond (count four).[9] In response, NJR, in addition to numerous special defenses, asserted a two count counterclaim against the plaintiff, alleging one count of breach of contract related to damages sustained as a result of the delayed delivery of the beams (count one), and one count of an alleged violation of CUTPA (count two). The plaintiff answered NJR's counterclaim and asserted as a special defense, inter alia, that NJR failed to mitigate its damages.

The matter was tried to the court on June 5, 6 and 7, 2018. Thereafter, the parties submitted posttrial briefs. Subsequently, the court rendered judgment in favor of the plaintiff on its breach of contract claim against NJR (count one of the complaint), in favor of NJR on the plaintiff's § 49-41a claim (count two of the complaint), in favor of Aegis on the plaintiff's § 49-42 claim (count three of the complaint), and in favor of NJR on its breach of contract and CUTPA claims (counts one and two of NJR's counterclaim). In its memorandum of decision, the court addressed the parties' various claims as follows: With respect to the plaintiff's claims against NJR, the court first applied the factors set forth in § 241 of the Restatement (Second) of Contracts[10] and concluded that the plaintiff failed to substantially perform its contractual obligations to NJR and, consequently, materially breached the subcontract by virtue of its delayed delivery of the beams.[11] Although a mate-

rial breach by one party to a contract ordinarily excuses the nonbreaching party from performance thereunder; see *Bernstein* v. *Nemeyer*, 213 Conn. 665, 672–73, 570 A.2d 164 (1990); the court found that, because NJR had ultimately accepted the beams by using them to complete the project, the plaintiff was entitled to recover the contract amount pursuant to article 2 of the Uniform Commercial Code (UCC).[12] Whereupon, the court awarded the plaintiff $178,597.75 plus costs on its breach of contract claim against NJR. Second, turning to the Little Miller Act claims, asserted against NJR and Aegis pursuant to §§ 49-41a and 49-42, respectively, the court concluded that the plaintiff's material breach barred its recovery under that statutory framework.

The court next addressed NJR's counterclaim. First, in light of the damages caused by the plaintiff's breach in failing to deliver the beams by June 7, 2016, the court concluded that NJR was entitled to recover on its breach of contract count in the amount of $138,900.44,[13] plus attorney's fees pursuant to the subcontract to be determined at a later date by agreement of the parties.[14] The court also concluded that the plaintiff had not proven that NJR failed to mitigate its damages because, after it was determined that NJR could not realize the full potential of the incentive payments, NJR was required only to employ reasonable efforts to mitigate its damages, which it had done. Second, the court concluded that Tenedine's and Borkowski's false and misleading statements with respect to the readiness of the beams and the timing of their delivery constituted a violation of CUTPA, whereupon the court awarded NJR compensatory damages in the amount of $14,700, which it considered to be reflected in its award on the breach of contract count of NJR's counterclaim. The court declined to award additional attorney's fees under CUTPA in light of its award of fees pursuant to the subcontract. This appeal followed. Additional facts and procedural history will be set forth as necessary.

Before addressing the merits of the plaintiff's claims, we note that several claims involve challenges to the trial court's factual findings. Therefore, we set forth the standard of review generally applicable to our review of those types of challenges. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation

marks omitted.) *Connecticut Light & Power Co.* v. *Proctor*, 324 Conn. 245, 258–59, 152 A.3d 470 (2016).

I

The plaintiff's first claim, which relates to the breach of contract count of NJR's counterclaim, presents a challenge to the trial court's factual finding that the plaintiff's failure to deliver the beams to NJR by June 7, 2016, caused a delay in the completion of the project until August 31, 2016. Specifically, the plaintiff contends that the court's use of the date June 7, 2016—rather than June 29, 2016 (the date the beams were actually scheduled for delivery)—to measure damages was clearly erroneous and overinflated NJR's damages award on count one of its counterclaim by including the maximum incentive payment of $60,000. In response, NJR contends that the use of June 7, 2016, was not clearly erroneous because the subcontract specified a delivery date of June 7, 2016, and, in the alternative, it argues that any error was harmless because the evidence demonstrated that, had the plaintiff delivered the beams on June 29, 2016, NJR would have been able to reopen the road by July 19, 2016, in order to earn the maximum incentive payment. For the reasons that follow, we conclude that the court's use of June 7, 2016, inasmuch as it underpins the court's damages calculation, was not clearly erroneous.

The following additional factual findings are relevant to our resolution of this claim. At the outset of its memorandum of decision, the court emphasized the time sensitive nature of the project, referring to the 161 day completion requirement and the time restricting provision of the contract regarding the road closure. The court observed that, with respect to the incentive provision of the contract, NJR was "[o]bviously" eager to earn the maximum amount. NJR devised a fast-track work schedule to achieve this goal—a goal of which the plaintiff was distinctly aware. The court recognized that the subcontract specified a delivery date of no later than June 7, 2016. NJR ultimately scheduled delivery of the beams for June 29, 2016. With that delivery date scheduled, NJR anticipated earning the maximum $60,000 incentive payment and reopening Route 74 "well ahead" of the August 8, 2016 deadline. The plaintiff did not deliver the beams until July 26, 2016, and NJR completed the work on August 31, 2016.

The court found that, once the delay in delivery from June 7, 2016, to July 26, 2016, occurred, NJR reasonably abandoned its costly fast-track approach because it would no longer be able to earn any incentive payment.[15] In determining damages, the court explained that, "[e]ven working at the nonaccelerated pace and enduring delays by having to reschedule subcontractors and equipment rental, NJR would have reopened Route 74 by July 13, 2016, at the latest, had [the plaintiff] delivered the beams on time." That time frame was calculated

by utilizing June 7, 2016, as a start date and adding thirty-six days, representing the actual time of completion once the beams were delivered.

The plaintiff argues that the court's reliance on June 7, 2016, in its calculation of damages was clearly erroneous because NJR scheduled the beams' actual delivery for June 29, 2016, which would necessitate a finding that Route 74 would not reopen until August 4, 2016 (i.e., thirty-six days later)—a date well after July 19, 2016, the date by which NJR would have had to reopen Route 74 in order to earn the full incentive payment. We disagree.

Applying the principles articulated previously in this opinion governing our review of this claim, we highlight the following facts in evidence. NJR and the plaintiff signed the subcontract on February 3, 2016. Paragraph 4 thereof, titled "TIME," provides: "Supplier shall immediately begin work to insure that delivery of the Products shall be made in accordance with the requirements of the Schedule. Time is of the essence of this Purchase Order, and it is essential that the Products be provided to Purchaser in a manner and in accordance with the Schedule so as to permit Purchaser to complete construction of the Project in the fastest and most efficient manner possible. The dates indicated in Exhibit A may be modified only in accordance with the written consent of the Purchaser." This provision expressly referred to the delivery schedule set forth in exhibit A, which provided in part that the department "has scheduled the closure of Route 74 for the period from June 7, 2016 to August 26, 2016. Accordingly, Supplier's products are to be delivered to the jobsite on or before June 7, 2016."

Construing the subcontract's provisions together, we conclude that the beams necessarily were to be *ready for delivery* on or before June 7, 2016, to coincide specifically with the commencement of the scheduled closure of Route 74, which the subcontract indicated was scheduled by the department for the period June 7, 2016, to August 26, 2016. That NJR ultimately requested delivery of the beams for June 29, 2016, instead of June 7, 2016, did not alter the plaintiff's contractual obligation to have the beams ready and available for NJR by June 7, 2016, ergo any date requested after June 7, 2016. For that reason, the plaintiff improperly focuses its argument on the date NJR ultimately requested for the actual delivery of the beams, rather than the language of the subcontract, the intentions and expectations of the parties, and the practical realities of the project that led to the scheduling of the June 29, 2016 delivery date. The trial court utilized June 7, 2016, as the starting date to conclude that, "[e]ven working at the nonaccelerated pace and enduring delays by having to reschedule subcontractors and equipment rental, *NJR would have reopened Route 74 by July 13, 2016, at the latest*, had [the plaintiff] delivered the beams on time." (Emphasis

added.)

On the basis of our careful review of the evidence, we construe the court's timeline using June 7, 2016, as a start date, combined with a thirty-six day period of completion pursuant to a *nonaccelerated* working pace, as an ostensible worst case scenario.[16] Under that scenario, NJR would have earned the maximum incentive payment by reopening Route 74 on or before July 19, 2016. Because the court also determined that NJR was on track to earn the maximum incentive payment when it scheduled the beams to be delivered on June 29, 2016, *and* that NJR was working at an accelerated pace at that time, we cannot conclude that the court's use of June 7, 2016, to support its damages calculation was clearly erroneous.[17]

## II

The plaintiff next claims that the court improperly declined to find that NJR failed to mitigate its damages by failing to work on the project at an accelerated pace once the beams were actually delivered on July 26, 2016.[18] We are not persuaded.

"We have often said in the contracts and torts contexts that the party receiving a damage award has a duty to make reasonable efforts to mitigate damages. . . . What constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier. . . . Questions of fact are subject to the clearly erroneous standard of review. . . . To claim successfully that the plaintiff [or counterclaim plaintiff] failed to mitigate damages, the defendant [or counterclaim defendant] must show that the injured party failed to take reasonable action to lessen the damages; that the damages were in fact enhanced by such failure; and that the damages which could have been avoided can be measured with reasonable certainty. . . . Furthermore, [t]he duty to mitigate damages does not require a party to sacrifice a substantial right of his own in order to minimize a loss." (Citations omitted; internal quotation marks omitted.) *Sun Val, LLC* v. *Commissioner of Transportation*, 330 Conn. 316, 334, 193 A.3d 1192 (2018). The burden to prove the failure to mitigate damages rests with the breaching party. *Webster Bank, N.A.* v. *GFI Groton, LLC*, 157 Conn. App. 409, 424, 116 A.3d 376 (2015).

The trial court found the following additional facts. Once the plaintiff delivered the beams on July 26, 2016, NJR abandoned its fast-track approach to the project because it was no longer able to realize any incentive payment. The court stated that it "[did] not fault NJR for its decision to adopt a nonaccelerated work schedule" and recognized that NJR had been investing additional resources to maintain the accelerated work schedule. Applying the principles regarding the duty to mitigate damages, the court found that NJR slowed its

pace of work when it determined that it could not realize any incentive payment as a result of the plaintiff's delayed delivery of the beams and that NJR thereafter "employed a more typical effort to complete the project." The court concluded that NJR's efforts to complete the project were reasonable, NJR was not required to use extraordinary and more expensive methods following the plaintiff's belated delivery of the beams, and, as a result, NJR had not failed to mitigate its damages.

In support of its claim, the plaintiff argues that NJR should have accelerated its work following the delivery of the beams in order to minimize the disincentive penalty that it ultimately incurred. This argument is unavailing. As previously explained, a party need only employ reasonable efforts to mitigate its damages, and, on appellate review, we will disturb the trial court's findings to that end only if they were clearly erroneous. *Sun Val, LLC* v. *Commissioner of Transportation*, supra, 330 Conn. 334. The record provides ample support for the court's finding that NJR acted reasonably following delivery of the beams. For instance, Nicholas Mancini, the owner of NJR, testified that accelerating the work between July 26, 2016 (when the plaintiff delivered the beams) and August 19, 2016 (when the department requested that NJR reaccelerate its work) would have been akin to "throw[ing] good money after bad" because NJR already had lost the opportunity to earn any incentive payment. Additionally, Mancini testified that NJR could not recover the expense of accelerating the work and that it "had lost [its] subcontractors as to when they would be able to come back to the project." Giguiere also explained that the acceleration costs would have caused NJR to sustain significant losses—losses that may have been passed on to the plaintiff. Furthermore, NJR sent a letter to the department requesting relief from the entire disincentive penalty in the amount of $66,000, a request that was granted in part. See footnote 8 of this opinion.

In sum, because there was evidence in the record to support the trial court's finding that NJR acted reasonably with respect to the completion of the project following the delayed delivery of the beams, the plaintiff's claim fails.

### III

The plaintiff's third claim is that the court improperly rendered judgment in favor of Aegis on the plaintiff's payment bond claim pursuant to the Little Miller Act, specifically, § 49-42 (i.e., count three of the complaint), solely on the basis that the plaintiff could not prevail on its claim for interest and attorney's fees under § 49-41a (c). We agree.

The following additional facts and procedural history are relevant to our resolution of this claim. Count three of the plaintiff's complaint alleged in part that, on or

about December 14, 2015, Aegis executed and delivered a payment bond on behalf of NJR, as principal, to secure payment for labor and materials supplied to the project. The payment bond provided in relevant part: "That NJR Construction, LLC . . . as Principal, and Aegis Security Insurance Company . . . as Surety, are firmly bound and held unto the State of Connecticut as Obligee, in the sum of One Million Nine Hundred Eighty Two Thousand One Hundred Eighty One Dollars and No Cents ($1,982,181.00) for the payment whereof said Principal binds itself, its successors and assigns, himself, his heirs, executors, administrators and assigns, and said Surety binds itself, its successors and assigns, jointly and severally firmly by these presents. . . . NOW, THEREFORE, if [NJR] shall make payment for all materials and labor used or employed in the performance of such contract, to the extent, and in the manner required by the contract or by the General Statutes of Connecticut, as revised, then this obligation shall be null and void, otherwise it shall remain and be in full force and effect." The plaintiff further alleged that, on or about September 27, 2016, it put Aegis on notice of its claim against the payment bond in the amount of $252,020.60, and that, since such notice, it received a partial payment from NJR, leaving an unpaid balance of $179,500. The plaintiff alleged that Aegis was liable to it, pursuant to § 49-42, for that amount, plus interest, costs, and attorney's fees. It is undisputed that Aegis issued a payment bond in favor of NJR, as principal, in connection with the project and that the plaintiff complied with the notice requirements of § 49-42 with regard to its claim against the payment bond.

In its memorandum of decision, the trial court analyzed the plaintiff's Little Miller Act claims against NJR in count two (pursuant to § 49-41a) and against Aegis in count three (pursuant to § 49-42) together, making no mention of § 49-42 and focusing only on the rights and obligations set forth in § 49-41a. The court concluded that, because the plaintiff had materially breached the contract with NJR, it did not "substantially perform" its work pursuant to § 49-41a (c), and "[c]onsequently, [the plaintiff] cannot prevail on the second *and third* counts of its complaint . . . ." (Emphasis added.) According to the court, despite the fact that the plaintiff could recover from NJR under the UCC as a result of NJR's acceptance of the beams, the plaintiff could not recover from Aegis against the payment bond because it failed to substantially perform under the contract.

Our resolution of the plaintiff's claim requires us to interpret the relevant provisions of the Little Miller Act, specifically, §§ 49-41a and 49-42. Accordingly, we exercise plenary review. See, e.g., *Trinity Christian School* v. *Commission on Human Rights & Opportunities*, 329 Conn. 684, 694, 189 A.3d 79 (2018) (questions of statutory interpretation command plenary review).

"The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Boisvert* v. *Gavis*, 332 Conn. 115, 141–42, 210 A.3d 1 (2019).

In addition, because the payment bond executed by Aegis is a contract, the following principles of contract interpretation apply to our interpretation of the bond. "The standard of review for the interpretation of a contract is well established. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]. . . . If the language of [a] contract is susceptible to more than one reasonable interpretation, [however] the contract is ambiguous. . . . Ordinarily, such ambiguity requires the use of extrinsic evidence by a trial court to determine the intent of the parties, and, because such a determination is factual, it is subject to reversal on appeal only if it is clearly erroneous." (Internal quotation marks omitted.) *Joseph General Contracting, Inc.* v. *Couto*, 317 Conn. 565, 575, 119 A.3d 570 (2015). Further, "[w]here a statutory bond is given, the provisions of the statute will be read into the bond. . . . If the law has made the instrument necessary, the parties are deemed to have had the law in contemplation when the contract was executed." (Citations omitted; internal quotation marks omitted.) *New Britain Lumber Co.* v. *American Surety Co.*, 113 Conn. 1, 5–6, 154 A. 147 (1931).

"It is a fundamental precept of suretyship law that the liability of the surety is conditioned on accrual of some obligation on the part of the principal; the surety will not be liable on the surety contract if the principal has not incurred liability on the primary contract. . . . In the absence of limitations or restrictions contained in the (surety) contract, the liability of the surety is coextensive with that of the principal. . . . The surety's promise is in the same terms as that of the principal and the consequent duty similar and primary . . . ."

(Citations omitted; internal quotation marks omitted.) *Star Contracting Corp.* v. *Manway Construction Co.*, 32 Conn. Supp. 64, 66, 337 A.2d 669 (1973). Stated differently, a surety stands in the principal's shoes and may assert defenses that are available to the principal. *Board of Supervisors* v. *Southern Cross Coal Corp.*, 238 Va. 91, 96, 380 S.E.2d 636 (1989).

In general terms, the Little Miller Act, set forth in General Statutes §§ 49-41 through 49-43, "provide[s] for the furnishing of bonds guaranteeing payment (payment bonds) on public works construction projects, [and was] enacted to protect workers and materials suppliers on public works projects who cannot avail themselves of otherwise available remedies such as mechanic's liens. . . . Section 49-41 requires that the general contractor provide a payment bond with surety to the state or governmental subdivision, which bond shall guarantee payment to those who supply labor and materials on a public works project. . . . Section 49-42 provides that any person who has performed work or supplied materials on a public works project, but who has not received full payment for such materials or work, may enforce his right to payment under the payment bond.

"This legislation, known as the Little Miller Act (act), was patterned after federal legislation popularly known as the Miller Act; [40 U.S.C. § 3131 et seq., formerly] 40 U.S.C. §§ 270a through 270d; and, therefore, [our Supreme Court has] regularly consulted federal precedents to determine the proper scope of our statute. . . . The federal precedents, like our own, counsel liberal construction of statutory requirements other than those relating to specific time constraints. . . . As the United States Supreme Court has stated, the federal Miller Act is highly remedial in nature . . . [and] entitled to a liberal construction and application in order properly to effectuate the [legislative] intent to protect those whose labor and materials go into public projects." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 714–16, 687 A.2d 506 (1997). "The very purpose of a surety bond under the Miller Act, and indeed, generally, is to ensure that claimants who perform work are paid for the work in the event and even if the principal does not pay." *United States on Behalf of Kitchens To Go* v. *John C. Grimberg Co.*, 283 F. Supp. 3d 476, 483 (E.D. Va. 2017).

Section 49-41 (a) provides in relevant part: "Each contract exceeding one hundred thousand dollars in amount for the construction . . . of any public building or public work of the state . . . shall include a provision that the person to perform the contract shall furnish to the state . . . on or before the award date, a bond in the amount of the contract which shall be binding upon the award of the contract to that person, with a surety or sureties satisfactory to the officer

awarding the contract, *for the protection of persons supplying labor or materials in the prosecution of the work provided for in the contract* for the use of each such person . . . ." (Emphasis added.)

Section 49-41a relates to the enforcement of payment obligations pursuant to a public works contract by a general contractor to a subcontractor and by a subcontractor to its subcontractors. Subsection (a) thereof provides in relevant part: "When any public work is awarded by a contract for which a payment bond is required by section 49-41, the contract for the public work shall contain the following provisions: (1) A requirement that the general contractor, within thirty days after payment to the contractor by the state or a municipality, pay any amounts due any subcontractor, whether for labor performed or materials furnished, when the labor or materials have been included in a requisition submitted by the contractor and paid by the state or a municipality . . . ."

Section 49-41a (c), on which the trial court relied in its disposition of the plaintiff's § 49-42 claim against Aegis, provides in relevant part: "If payment is not made by the general contractor . . . in accordance with such requirements, the subcontractor shall set forth his claim against the general contractor . . . through notice by registered or certified mail. Ten days after the receipt of that notice, the general contractor shall be liable to its subcontractor . . . for interest on the amount due and owing at the rate of one per cent per month. In addition, the general contractor, upon written demand of its subcontractor . . . shall be required to place funds in the amount of the claim, plus interest of one per cent, in an interest-bearing escrow account in a bank in this state, provided the general contractor . . . may refuse to place the funds in escrow o*n the grounds that the subcontractor has not substantially performed the work according to the terms of his or its employment*. In the event that such general contractor . . . refuses to place such funds in escrow, *and the party making a claim against it under this section is found to have substantially performed its work in accordance with the terms of its employment in any arbitration or litigation to determine the validity of such claim*, then such general contractor . . . shall pay the attorney's fees of such party." (Emphasis added.)

We pause at this juncture to emphasize that the term "substantially performed" appears in two places in § 49-41a (c). First, the term appears in connection with a general contractor's (or subcontractor's) ability to "refuse to place the funds in escrow on the grounds that the subcontractor [making the claim] has not *substantially performed* the work according to the terms of his or its employment." (Emphasis added.) Second, the term appears in connection with a subcontractor's ability to recover attorney's fees under § 49-41a (c),

namely, when the principal refuses to place such funds in escrow and the subcontractor "is found to have *substantially performed* its work in accordance with the terms of its employment in any arbitration or litigation to determine the validity of such claim . . . ." (Emphasis added.) There is no language in § 49-41a (c) or § 49-42 to suggest that either of these provisions was intended to be engrafted into § 49-42.

Section 49-42 (a), pursuant to which the plaintiff brought its claim against Aegis, provides in relevant part: "(1) Any person who performed work or supplied materials for which a requisition was submitted to . . . the awarding authority and who does not receive full payment for such work or materials within sixty days of the applicable payment date provided for in subsection (a) of section 49-41a . . . may enforce such person's right to payment under the bond by serving a notice of claim on the surety that issued the bond and a copy of such notice to the contractor named as principal in the bond not later than one hundred eighty days after the last date any such materials were supplied or any such work was performed by the claimant. . . . Not later than ninety days after service of the notice of claim, the surety shall make payment under the bond and satisfy the claim, or any portion of the claim which is not subject to a good faith dispute, and shall serve a notice on the claimant denying liability for any unpaid portion of the claim. The surety's failure to discharge its obligations under this section shall not be deemed to constitute a waiver of defenses the surety or its principal on the bond may have or acquire as to the claim, except as to undisputed amounts for which the surety and claimant have reached agreement. If, however, the surety fails to discharge its obligations under this section, then the surety shall indemnify the claimant for the reasonable attorneys' fees and costs the claimant incurs thereafter to recover any sums found due and owing to the claimant. . . .

"(2) If the surety denies liability on the claim, or any portion thereof, the claimant may bring an action upon the payment bond in the Superior Court for such sums and prosecute the action to final execution and judgment. . . . In any such proceeding, the court judgment shall award the prevailing party the costs for bringing such proceeding and allow interest . . . computed from the date of service of the notice of claim, provided, for any portion of the claim which the court finds was due and payable after the date of service of the notice of claim, such interest shall be computed from the date such portion became due and payable. The court judgment may award reasonable attorneys' fees to either party if upon reviewing the entire record, it appears that either the original claim, the surety's denial of liability, or the defense interposed to the claim is without substantial basis in fact or law. . . ."

Section 49-42 explains the enforcement procedure a subcontractor must undertake to recover against a payment bond. As set forth in subdivision (1) of subsection (a), a subcontractor may enforce its right to payment under a bonded public works contract by serving a notice of claim on the surety not later than 180 days after the last delivery of materials or completion of work. The surety is required to satisfy the claim within ninety days of service of the notice, *unless* the claim, or any portion thereof, is subject to a good faith dispute. If the surety fails to comply with these provisions, and the subcontractor thereafter initiates proceedings to recover the amounts owed from the surety, it must indemnify the subcontractor for reasonable attorney's fees and costs. General Statutes § 49-42 (a) (1). Subdivision (2) explains how a subcontractor may recover from the surety in the event the surety denies liability on the claim.

As this court stated in *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 32 Conn. App. 118, 628 A.2d 601 (1993), although remedies pursuant to §§ 49-41a and 49-42 "may be pursued jointly in a single action against both the general contractor and the surety, these two statutory rights are separate and distinct, designed by the legislature to accomplish separate and distinct ends." Id., 128; see also *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.*, 207 Conn. 468, 482, 542 A.2d 692 (1988) (notice provision of § 49-41a (b) "is not . . . a statutory prerequisite to the initiation of suit by a subcontractor under § 49-42, a remedy that existed long before § 49-41a (b) came on the scene").

With the relevant statutory framework and language of the payment bond in mind, we conclude that the court erred in rendering judgment in favor of Aegis on the plaintiff's § 49-42 claim. As an initial matter, we observe that, although *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, supra, 32 Conn. App. 128, instructs that a subcontractor's statutory rights against its general contractor and the surety serve distinct ends, by analyzing the plaintiff's Little Miller Act claims against NJR and Aegis together under § 49-41a, while making no mention of § 49-42, the court effectively made Aegis's liability under § 49-42 dependent on the plaintiff's succeeding against NJR under § 49-41a. However, there is no language in the payment bond or the Little Miller Act to prevent Aegis from being held jointly and severally liable for the amount for which NJR, as the bonded principal, is liable under the UCC, even though the court did not award the plaintiff interest and attorney's fees pursuant to § 49-41a (c) against NJR. Instead, pursuant to the express terms of the payment bond, Aegis is jointly and severally liable with NJR for the unpaid balance of the subcontract. The court concluded that NJR was liable under the UCC for the "unpaid contract price" and rendered judgment accord-

ingly, in favor of the plaintiff, on count one in the amount of $178,597.75 plus costs.[19] In the absence of NJR's "mak[ing] payment for all materials and labor used or employed in the performance of" the subcontract, as stated in the payment bond, Aegis' obligation remains in full force and effect. Moreover, as explained previously in this opinion, neither § 49–41a (c) nor § 49-42 contains any language to suggest that the substantial performance language of the former applies to a subcontractor's claim under the latter against a surety.[20] To reach a contrary conclusion would contradict the plain meaning of § 49-42 and would run afoul of the highly remedial nature of the Little Miller Act, which serves to protect those whose materials are used in public projects. On the basis of the foregoing, we conclude that the court erred in rendering judgment in favor of Aegis on the plaintiff's § 49-42 claim on the basis that the plaintiff could not prevail on its claim for interest and attorney's fees under § 49-41a (c). Accordingly, we reverse the judgment as to count three and remand the case for a new trial on that count only.[21]

## IV

The plaintiff's fourth claim is that, in connection with count two of its complaint, which was directed against NJR, the court erred by failing to award it attorney's fees and interest pursuant to § 49-41a on the ground that it failed to substantially perform under the subcontract. The plaintiff limits this claim to its contention that the trial court erred by failing to recognize that NJR had implicitly waived the "time is of the essence" provision in the subcontract. In response, NJR contends, inter alia, that the plaintiff's claim is not reviewable because the plaintiff raises it for the first time on appeal. We agree with NJR.

"Our appellate courts, as a general practice, will not review claims made for the first time on appeal. . . . [A]n appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . [B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court. . . . The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the precise matter on which its decision is being asked." (Internal quotation marks omitted.) *IP Media Products, LLC* v. *Success, Inc.*, 191 Conn. App. 413, 421, 215 A.3d 1226, cert. denied, 333 Conn. 926, 217 A.3d 994 (2019).

In its memorandum of decision, the court, relying on the five factors set forth in § 241 of the Restatement (Second) of Contracts,[22] concluded that the plaintiff had not substantially performed its contractual obligations, such that it could not recover its attorney's fees under § 49-41a. See General Statutes § 49-41a (c) (subcontractor making claim against general contractor under § 49-41a must be "found to have substantially performed its

work in accordance with the terms of its employment in any arbitration or litigation to determine the validity of such claim" in order to recover attorney's fees from general contractor). On appeal, the plaintiff claims that the court incorrectly applied such factors because it failed to recognize that NJR implicitly waived the "time is of the essence" provision in the subcontract. Thus, the plaintiff argues, it was not contractually required to deliver the beams by June 7, 2016, and it substantially performed under the subcontract by delivering the beams on July 26, 2016, notwithstanding NJR's request that the beams actually be delivered on June 29, 2016.[23] NJR contends that the plaintiff did not raise at trial the issue of whether NJR waived the "time is of the essence" provision in the subcontract. Notably, the plaintiff does not contend otherwise in its appellate reply brief, and our review of the record reveals no such claim. Therefore, we decline to address it for the first time on appeal. See, e.g., *IP Media Products, LLC* v. *Success, Inc.*, supra, 191 Conn. App. 421.

V

The plaintiff next claims that the court incorrectly concluded that its actions rose to the level of a CUTPA violation. We disagree.

We begin by setting forth the standard of review and the applicable principles of law. "It is well settled that whether a [party's] acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Pedrini* v. *Kiltonic*, 170 Conn. App. 343, 353, 154 A.3d 1037, cert. denied, 325 Conn. 903, 155 A.3d 1270 (2017).

Our Supreme Court has stated that "[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three

criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . .” (Internal quotation marks omitted.) *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350–51, 994 A.2d 153 (2010), quoting *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 18–19, 938 A.2d 576 (2008). In the absence of aggravating circumstances, a simple breach of contract is insufficient to establish CUTPA liability. See *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, 125 Conn. App. 678, 704–705, 10 A.3d 61 (2010), cert. denied, 300 Conn. 914, 13 A.3d 1100 (2011).

The following additional findings and observations by the trial court are relevant to our consideration of this claim. The court first recognized that “NJR does not claim, nor could it, that [the plaintiff’s] failure to meet the delivery deadline in the purchase order agreement was, per se, an unfair or deceptive trade practice under CUTPA.” Instead, NJR’s CUTPA claim focused on the deceptive conduct of the plaintiff’s employees and/or agents, namely, Tenedine and Borkowski. As found by the trial court, on May 5, 2016, Giguiere e-mailed Tenedine to inquire about when the beams would be ready. Tenedine responded that they would be ready by May 27. On the basis of that time frame, Borkowski instructed Giguiere to schedule delivery of the beams for June 29 through the plaintiff’s shipping department. Around June 13, 2016, Giguiere spoke with Borkowski by telephone to arrange the dry fit test. Borkowski assured Giguiere that the beams were ready, despite the fact that none of the beams had been poured by June 13, 2016. On June 27, 2016, just two days before the scheduled delivery, at 6:45 a.m., the plaintiff informed Giguiere that *none* of the ten beams was ready. Giguiere then tried to communicate with Borkowski several times without any response. At the emergency meeting on June 29, 2016, with the department, neither Borkowski nor Tenedine provided a specific explanation for the failure to produce the beams. As the court stated: “The court infers that [the plaintiff’s] misleading statements were communicated in response to direct inquiries by NJR regarding the status of the beams, to conceal from NJR the true state of affairs. These deceptive responses deflected NJR from further inquiry and the possibility of devising ways to remedy or mitigate the problem.”

Against this backdrop, the court found that Tenedine's "communicating to NJR unfounded assurances that beam fabrication was progressing on schedule, and the false declaration by Borkowski that the beams were fabricated and available, so that a delivery date could be scheduled through [the plaintiff's] dispatcher" constituted "prevarications [that] were clearly immoral, unethical, and/or unscrupulous." The court went on to find that "[s]uch misleading information substantially injured NJR by leading NJR into making unnecessary and/or premature plans and expenditures for labor allocation, equipment procurement, and an inutile construction schedule. Also, customers, such as NJR, were reasonably likely to assume a sense of confidence and security based on these inaccuracies and to pass that misinformation along to others, including [the department]. That put NJR's competency in a bad light and required an emergency meeting with [the department] to seek out some resolution." Finally, the court found that "the unwarranted representations deterred NJR from taking remedial action had it known of the true state of affairs." On the basis of the foregoing, the court concluded that the plaintiff's deceptive conduct violated CUTPA. The court further concluded that the plaintiff's CUTPA violations resulted in an ascertainable loss to NJR in the form of monetary expenditures to rent equipment and to reschedule other subcontractors and/or utility providers. Those expenses totaled $14,695.44.

On appeal, the plaintiff contends that the court's findings that the plaintiff's incorrect and/or unwarranted representations about the readiness of the beams were "clearly immoral, unethical, and/or unscrupulous" are clearly erroneous because there was no evidence that such statements were made with "ill intent." The plaintiff argues that, at most, NJR's claim is one for a simple breach of contract and that the evidence is devoid of the requisite aggravating circumstances to rise to the level of a CUTPA violation. We are not persuaded.

Contrary to the plaintiff's contentions, it did not merely breach the subcontract. Stated plainly, it communicated false information that caused NJR to incur additional expense. The factual findings recited previously in this opinion regarding the nature of the falsehoods conveyed to NJR, coupled with the effect that such conduct had on NJR, readily support the imposition of CUTPA liability on the plaintiff. See *Milford Paintball, LLC* v. *Wampus Milford Associates, LLC*, 156 Conn. App. 750, 762–66, 115 A.3d 1107 (evidence that plaintiff detrimentally relied on defendant's negligent misrepresentations sufficient to impose CUTPA liability), cert. denied, 317 Conn. 912, 116 A.3d 812 (2015); *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, supra, 125 Conn. App. 708 (defendant's pattern of bad faith conduct in

breaching parties' agreement, as well as aggravating circumstances, amply supported finding of CUTPA violation). Although we are cognizant that "[n]ot every misrepresentation constitutes a CUTPA violation"; *Calandro* v. *Allstate Ins. Co.*, 63 Conn. App. 602, 617, 778 A.2d 212 (2001); the court's findings were supported by the record and, therefore, were not clearly erroneous.

VI

The plaintiff's final claim is that the court erred in awarding attorney's fees to NJR pursuant to the subcontract because NJR did not incur attorney's fees as a result of any default on the part of the plaintiff. NJR asserts that the plaintiff's argument is premised on a flawed interpretation of the subcontract. We agree with NJR.

The plaintiff's claim requires us to determine what the parties intended by the language of the "default-remedies" provision in their subcontract. Therefore, we exercise plenary review. See *Auto Glass Express*, *Inc.* v. *Hanover Ins. Co.*, 293 Conn. 218, 225, 975 A.2d 1266 (2009). "The intent of the parties as expressed in [writing] is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the [writing]. . . . Where the language of the [writing] is clear and unambiguous, the [writing] is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a [written instrument] must emanate from the language used in the [writing] rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) Id., 226.

It is well established that parties may contract around the traditional American Rule for attorney's fees, pursuant to which each party bears its own expenses. See *Ferri* v. *Powell-Ferri*, 326 Conn. 438, 451–52, 165 A.3d 1137 (2017). In the present case, where the hearing on the amount of attorney's fees to be awarded has been stayed pending our decision on appeal; see footnote 14 of this opinion; we need to determine only whether the award of attorney's fees was permitted by the parties' contract.[24]

Mindful of the foregoing, we turn to the language of the subcontract. Section 8, titled "DEFAULT-REMEDIES," provides in relevant part: "Should Supplier [i.e., the plaintiff] at any time: (a) fail to supply the Products [defined to include the beams at issue] in sufficient

quantities and of required quality to perform its obligations hereunder with the skill, conformity, *promptness and diligence* required hereunder . . . or (c) fail in the performance or observance of any of the covenants, conditions, or other terms of this [p]urchase [o]rder, then in any such event, *each of which shall constitute a default hereunder by Supplier*, Purchaser [i.e., NJR] shall have the right to exercise any one or more of the following remedies . . . (iii) recover from Supplier all losses, damages, penalties and fines . . . and *all reasonable attorneys' fees and other expenses suffered or incurred by Purchaser by reason or as a result of Supplier's default*." (Emphasis added.) By the express terms of the subcontract, a "fail[ure] to supply" the beams with "promptness and diligence" by the plaintiff "shall constitute a default" on the part of the plaintiff. The provision goes on to provide that NJR has the right to recover, among other things, all reasonable attorney's fees and other expenses it incurred as a result of such default. In light of the court's finding that the plaintiff failed to supply the beams with promptness and diligence—a finding that we leave undisturbed—we conclude that the court's determination that reasonable attorney's fees and expenses incurred by NJR as a result of such failure should be awarded pursuant to the subcontract was not in error.

The plaintiff claims that NJR is not entitled to recover attorney's fees pursuant to the foregoing provision because NJR is the defendant in the present action and, therefore, NJR has incurred attorney's fees only in defending the action, rather than commencing it as a result of the plaintiff's default. The plaintiff's argument is belied by the language of the provision at issue. Simply put, nothing in the provision prevents NJR from recovering attorney's fees on a successful breach of contract claim that is premised on the plaintiff's failure to supply the beams in a prompt and diligent manner simply because the claim was prosecuted as part of a counterclaim.

The judgment is reversed only with respect to the plaintiff's claim against Aegis pursuant to § 49-42 and the case is remanded for further proceedings consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The trial court rendered judgment in favor of the plaintiff on its breach of contract claim against NJR in the amount of $178,597.75, plus costs. NJR has not cross appealed from that judgment.

[2] Pursuant to General Statutes § 49-41, NJR procured a payment bond, with Aegis as surety, in the amount of $1,982,181.

[3] Because this appeal involves two contracts, one between the department and NJR, and one between NJR and the plaintiff, we will refer to the former as the "contract" and the latter as the "subcontract" throughout this opinion for clarity.

[4] A handwritten note adjacent to the delivery date term in the subcontract indicates "date dependent upon timely turn around of shop drawings." The trial court's memorandum of decision indicates that the shop drawings were promptly approved and caused no attributable delay beyond the June 7,

2016 delivery date. Neither party makes any claim on appeal with respect to that finding.

[5] The court found that the department wanted the closure of Route 74 to "coincide with the school vacation period in [the] summer," as the project required the closure of a main school bus route.

One hundred and sixty-one days from March 24, 2016, was August 31, 2016.

[6] The court explained: "It takes about one week to set up the mold for the beams. Then, prestressed steel strands and other items are inserted and inspected. Next, concrete is poured. This takes about two days. A crane removes the hardened beams and stores them until a dry fit is performed. Then, [the plaintiff] schedules delivery. The eight interior beams are identical and can be formed using the same mold. The two end beams require assembly of a different mold. . . . A dry fit seeks to ensure that all the beams match up correctly before shipment so that adjustments can be made at the fabrication yard rather than at the job site during attempts at installation."

[7] NJR states that the term "prestress" necessarily refers to the ten bridge beams because they were the only products supplied by the plaintiff that were prestressed. The only items in the subcontract that were delineated as "prestressed" were the ten beams. In addition, the plaintiff's briefing refers to the beams as "prestressed concrete beams."

[8] Because the project was completed twenty-three days after August 8, 2016, the court found that NJR incurred a disincentive penalty of $69,000. An amount of $4795 was later excused by the department.

[9] At the start of trial, the plaintiff withdrew count four of its complaint against Aegis.

[10] Section 241 of the Restatement (Second) of Contracts provides: "In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

"(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

"(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

"(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

"(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

"(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." 2 Restatement (Second), Contracts § 241, p. 237 (1981).

[11] A fair reading of the court's memorandum of decision indicates that it concluded that the plaintiff materially breached its contract with NJR. "[S]ubstantial performance is the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered . . . ." (Internal quotation marks omitted.) *21st Century North America Ins. Co.* v. *Perez*, 177 Conn. App. 802, 815, 173 A.3d 64 (2017), cert. denied, 327 Conn. 995, 175 A.3d 1246 (2018).

[12] Specifically, the court applied General Statutes § 42a-2-607, which provides in relevant part: "(1) The buyer must pay at the contract rate for any goods accepted. . . ." NJR does not challenge the determination that it was required to pay the balance of the subcontract amount because it accepted the untimely delivery of the beams.

[13] This amount included a disincentive penalty of $64,205, the loss of a $60,000 incentive payment, and additional equipment rental fees of $14,695.44.

[14] Following the entry of judgment and the plaintiff's filing of this appeal, NJR filed a motion for attorney's fees. The plaintiff filed a motion to stay the adjudication of the motion for attorney's fees pending the resolution of this appeal, which was granted by the trial court.

[15] The court found that NJR had "sustained losses by virtue of [the] rescheduling of other subcontractors and added equipment rental costs" totaling $22,320. The court also stated that the fast-track approach required NJR to provide added manpower and overtime wages, expenditures that NJR reasonably did not make following the seven week delay in delivery.

[16] This conclusion is further bolstered by the testimony of Nicholas Mancini, NJR's owner, that the beams were to be ready by June 7, 2016, so that NJR could then schedule their delivery to the jobsite.

[17] Even if the use of June 7, 2016, rather than June 29, 2016, was clearly erroneous, it was harmless because, under either date, NJR was in line to

receive the maximum incentive payment. "Where . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's [fact-finding] process, a new hearing is required." (Internal quotation marks omitted.) *LeBlanc* v. *New England Raceway, LLC*, 116 Conn. App. 267, 281, 976 A.2d 750 (2009). A trial court's decision that "rests on a clearly erroneous factual finding" requires a new trial. *Downing* v. *Dragone*, 184 Conn. App. 565, 573, 195 A.3d 699 (2018).

As we have explained, the court found that NJR was on track to earn the maximum incentive payment, achieved by opening Route 74 on or before July 19, 2016, when it scheduled delivery of the beams for June 29, 2016. Although the court did not make a particular finding that the road would have been opened in twenty days—between June 29 and July 19, 2016— the evidence presented at trial was sufficient to do so. Giguiere explained, in detail, the tasks that NJR was to undertake had the beams arrived on June 29, and the amount of time needed for each task. For example, on June 14, 2016, Giguiere requested the installation of the bridge's handrail during the week of July 11, 2016. According to Giguiere, this was one of the last items to be completed prior to opening Route 74. Several of the activities following the delivery of the beams could have been completed simultaneously. Indeed, he testified that NJR was on track to open the bridge on July 18, 2016. Therefore, even if the court's use of June 7, 2016, was clearly erroneous, it was harmless because had it used the later date, it could have reached the same conclusion. Put differently, under *either* date, the court had sufficient evidence to reach the same result with respect to NJR's earning of the maximum incentive payment. We are not persuaded, then, that the error was harmful to the plaintiff.

The plaintiff relatedly contends that NJR failed to prove its damages with reasonable certainty. Specifically, the plaintiff argues that, with respect to the incentive payment, there was no evidence that NJR could have opened Route 74 in twenty days. The plaintiff also points to the fact that the project schedules did not reflect a July 19, 2016 completion date and that NJR did not proffer a schedule analysis at trial. We reject these arguments. The court was presented with evidence that NJR was set to earn the maximum incentive payment had the beams been timely delivered. In addition, because NJR was incentivized to recoup that payment, and because there was testimony indicating that NJR could work at a faster pace than reflected in the project schedules, the plaintiff's argument, which hinges on the dates provided in the schedules, is not convincing.

Finally, the plaintiff avers that NJR failed to prove that the disincentive penalty it incurred was caused by the plaintiff's delayed delivery on July 26, 2016, because NJR failed to accelerate its work once delivery occurred. That contention fails for the reasons set forth in part II of this opinion.

[18] Although the plaintiff introduces this claim in its principal appellate brief by stating that "the trial court committed legal error in failing to apply the duty to mitigate to NJR," the plaintiff does not provide any support for the notion that the court refused to apply failure to mitigate principles or failed to otherwise recognize the plaintiff's second special defense to both counts of NJR's counterclaim, alleging a failure to mitigate. Indeed, the trial court expressly applied such principles and found that the plaintiff (as the counterclaim defendant) had failed to prove a failure to mitigate on the part of NJR. What the plaintiff actually challenges on appeal are the trial court's findings of fact. We consider the plaintiff's claim accordingly.

[19] We iterate that no cross appeal was taken from the judgment as to count one.

[20] Section 49-42 does, however, permit a surety to withhold payment on a claim that is subject to a good faith dispute. In the present case, the trial court made no findings as to whether the plaintiff's claim for payment under the bond was, in fact, such a claim. On remand, any adjudication by the court of count three shall express a finding as to what portion, if any, of the plaintiff's claim against Aegis was subject to a good faith dispute.

[21] On remand, the trial court will have to determine the scope of Aegis's liability under § 49-42 once the remaining claims for costs, interest, and attorney's fees are adjudicated on a fully developed record.

[22] See footnote 10 of this opinion.

[23] The plaintiff does not otherwise challenge the trial court's application of the Restatement factors.

[24] Notwithstanding the fact that the trial court has yet to determine the

amount of attorney's fees, the award of attorney's fees in favor of NJR on its breach of contract claim is a final judgment under *Ledyard* v. *WMS Gaming, Inc.*, 330 Conn. 75, 89–90, 191 A.3d 983 (2018), because it does not constitute a supplemental postjudgment award of attorney's fees.

---