******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# BLAKESLEE ARPAIA CHAPMAN, INC. *v.* KIEWIT INFRASTRUCTURE CO. ET AL.
## (AC 47355)

Cradle, C. J., and Seeley and Wilson, Js.

*Syllabus*

The defendant Connecticut Port Authority appealed from the trial court's judgment denying its motion to dismiss the plaintiff's unjust enrichment claim. The defendant claimed, inter alia, that the court erred in concluding that it was not entitled to sovereign immunity. *Held*:

The trial court properly denied the defendant's motion to dismiss on the ground that it failed to meet its burden of establishing that it was an arm of the state that was entitled to sovereign immunity, as this court was persuaded by the defendant's enabling legislation (§ 15-31a et seq.) that the legislature did not intend for it to be treated as an arm of the state, and this court's consideration of the remaining factors set forth in *Gordon* v. *H.N.S. Management Co.* (272 Conn. 81), employed when deciding whether an entity properly may assert a sovereign immunity defense, did not persuade it to the contrary.

This court dismissed the defendant's appeal as to its claim that the trial court erred by rejecting its argument that the plaintiff's claim was barred by statute (§ 49-41) because the plaintiff was protected by the posting of a payment bond, as this court, having agreed with the trial court's conclusion that the defendant had failed to raise a colorable claim of sovereign immunity, found that the trial court's denial of the defendant's motion to dismiss as to this claim constituted an interlocutory ruling and, thus, was not a final judgment for purposes of appeal.

Argued December 2, 2025—officially released May 26, 2026

*Procedural History*

Action to recover damages for, inter alia, unjust enrichment, and for other relief, brought to the Superior Court in the judicial district of New London and transferred to the judicial district of Hartford, Complex Litigation Docket, where the court, *Noble, J.*, denied the motion to dismiss filed by the defendant Connecticut Port Authority, and the defendant Connecticut Port Authority appealed to this court. *Appeal dismissed in part*; *affirmed*.

*Linda L. Morkan*, with whom were *Frederick E. Hedberg* and, on the brief, *Lisa A. Andrzejewski*, for the appellant (defendant Connecticut Port Authority).

*Patrick T. Clendenen*, with whom was *Jordan J. Kowalski*, for the appellee (plaintiff).

*Jeffrey J. Mirman*, with whom were *Luke R. Conrad* and, on the brief, *Christopher B. Wiezbicki*, for the appellees (named defendant et al.).

*Opinion*

CRADLE, C. J. The defendant Connecticut Port Authority[1] appeals from the judgment of the trial court denying its motion to dismiss the unjust enrichment claim filed against it by the plaintiff, Blakeslee Arpaia Chapman, Inc. The defendant claims that the court erred in (1) concluding that it was not entitled to sovereign immunity and (2) rejecting its argument that the plaintiff's unjust enrichment claim was barred by General Statutes § 49-41 because the plaintiff was protected by the posting of a payment bond. We agree with the trial court's conclusion that the defendant is not entitled to sovereign immunity and therefore affirm the denial of the motion to dismiss on that ground. We dismiss the defendant's second claim on appeal for lack of a final judgment.

The following facts, as alleged in or necessarily implied from the plaintiff's complaint, and procedural history are relevant to our resolution of the defendant's claims on appeal. On December 18, 2020, Kiewit Infrastructure Co. (Kiewit) entered into a contract with the defendant for the construction of the project known as "Infrastructure Improvements to Connecticut State Pier—New London, CT" (project). On March 26, 2021, Kiewit entered into a subcontract with the plaintiff wherein the plaintiff agreed to provide certain labor, tools, materials, equipment and supervision services for the project. Kiewit contracted to pay the plaintiff $1,877,290, subject to certain

---

[1]Kiewit Infrastructure Co. and Travelers Casualty and Surety Company of America also are defendants in this case. Because this appeal concerns only the denial of the motion to dismiss filed by the Connecticut Port Authority, any reference herein to the defendant is to the Connecticut Port Authority only.

adjustments, for its performance under the subcontract. Specifically, the plaintiff agreed to perform work on the project for the demolition and disposal of four existing mooring dolphins, which was generally included and described under the scope of work as mobilization and demobilization; demolition and disposal; and submittals.[2] On April 30, 2021, Kiewit, as principal and contractor, and Travelers Casualty and Surety Company of America (Travelers), as surety, agreed to the terms of a payment bond under §49-41 in the amount of $204,000,000 for the protection of all persons supplying labor, materials, and equipment furnished, used or reasonably required for use in the construction of the project.

In July 2021, the plaintiff conducted an underwater inspection survey to determine the condition of the mooring dolphins and piles. That inspection revealed that the piles were substantially and materially different from what was stated in the bid documents. Because the piles were not structurally sound, the plaintiff notified Kiewit that the unanticipated poor condition of the piles increased the size and scope of the work necessary to complete the project, which would require additional time and increase the cost of the project. With Kiewit's knowledge and direction, the plaintiff modified its dive plan, project means and methods, schedule and costs to accommodate the unforeseen and unanticipated site conditions. The plaintiff completed its work on the project on December 2, 2021. Despite numerous communications with the plaintiff regarding the extra work required to complete the project and the associated increased costs, Kiewit and the defendant refused to pay the plaintiff for the additional costs and expenses incurred by the plaintiff in the amount of $763,497.09. Travelers refused to pay the plaintiff under the payment bond for the extra work performed to complete the project.

---

[2]The mooring dolphins were structures that consisted of concrete mooring blocks supported by several piles, and the plaintiff agreed to remove and dispose of the concrete cap, concrete pile encasement, timber rubbing strips, timber fender piles, steel bearing piles, steel battered piles, rubber fenders, and all other items associated with the mooring dolphins.

In November 2022, the plaintiff commenced this action and, by way of a five count revised complaint filed on February 24, 2023, alleged, inter alia, unjust enrichment as to the defendant.[3] The plaintiff alleged that the defendant received a benefit from it due to the plaintiff's additional work on the project and that the defendant unjustly has refused to compensate it for that work.

On April 3, 2023, the defendant filed a motion to dismiss the plaintiff's claim against it on the grounds that the defendant was entitled to sovereign immunity because it is an "arm of the state" and the claim was barred by §49-41 because Kiewit had secured a payment bond for the plaintiff's protection.[4] The defendant filed a memorandum of law in support of its motion to dismiss, to which it appended several exhibits, including the following: an affidavit of Ulysses B. Hammond, the executive director of the defendant; the contract between the defendant and Kiewit; several memoranda of understanding or agreement between the defendant and other agencies; the defendant's 2022 annual operations and projects report; and the defendant's January 1, 2023 quarterly report to the Transportation Committee of the General Assembly. On April 19, 2023, the plaintiff filed a memorandum of law in opposition to the motion to dismiss, to which it appended an October 21, 2022 report of the Office of Legislative Research regarding quasi-public agencies. On November 22, 2023, the

[3] In its revised complaint, the plaintiff alleged the following additional causes of action: an action for enforcement of the right to a payment bond under General Statutes §49-42 as to Kiewit and Travelers; breach of contract as to Kiewit; breach of the implied covenant of good faith and fair dealing as to Kiewit; and violations of the Connecticut Unfair Trade Practices Act, General Statutes §42-110a et seq., as to Travelers.

[4] As the court later explained in its memorandum of decision: "[T]he [defendant] argues that the plaintiff's unjust enrichment cause of action is barred by §49-41 et seq. Specifically, the [defendant] asserts that §49-41 et seq. is modelled after the federal Miller Act, 40 U.S.C. §3131 et seq. The [defendant] contends that under the federal Miller Act, if an appropriate bond is furnished, subcontractors cannot state a claim based on unjust enrichment because of the absence of contractual privity. Rather, the federal Miller Act provides the subcontractor's exclusive remedy." (Footnotes omitted.)

defendant filed a reply to the plaintiff's opposition.[5] On January 8, 2024, the court heard oral argument on the parties' respective positions on the defendant's motion to dismiss.[6]

On January 25, 2024, the court filed a memorandum of decision denying the defendant's motion to dismiss. The court rejected the defendant's argument that it was entitled to sovereign immunity on the ground that the defendant's enabling legislation, General Statutes § 15-31a et seq., plainly states that the defendant "shall have the duty and power to . . . [s]ue and be sued in its own name . . . ." General Statutes § 15-31b (a) (4). The court also rejected the defendant's argument that the plaintiff's claim of unjust enrichment was barred by the payment bond under § 49-41.[7] This appeal followed.

I

The defendant first claims that the court incorrectly concluded that it was not entitled to sovereign immunity.[8] We disagree.

We begin by setting forth the applicable standard of review. "A motion to dismiss is the proper vehicle to

[5]The plaintiff also filed permission to file a surreply, along with its proposed surreply, to the defendant's reply to the plaintiff's opposition to the motion to dismiss. The court declined to consider the plaintiff's motion for permission to file a surreply because the plaintiff failed to timely request adjudication of that motion and the court declined to consider the surreply because the plaintiff had not received the court's permission to file it as required by Practice Book § 11-10 (c).

Kiewit and Travelers also filed a partial objection to the motion to dismiss. The court declined to consider "the pleadings filed by the codefendants because they are not interested parties to this motion."

[6]Neither party requested an evidentiary hearing on the motion to dismiss.

[7]The court noted that a motion to strike is the proper mechanism by which to assert such a claim but nevertheless addressed it.

[8]Although, ordinarily, the denial of a motion to dismiss is not an immediately appealable final judgment, the denial of a motion to dismiss that raises a colorable claim of sovereign immunity is a final judgment. See *Shay* v. *Rossi*, 253 Conn. 134, 165, 749 A.2d 1147 (2000) ("unless the state is permitted to appeal a trial court's denial of its motion to dismiss, filed on the basis of a colorable claim of sovereign immunity,

assert lack of jurisdiction over the subject matter. . . . [T]he doctrine of sovereign immunity implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss. . . . [O]ur review of the trial court's ultimate legal conclusion and resulting [denial] of the motion to dismiss [is] de novo. . . . Furthermore, to the extent that we are called upon to engage in statutory interpretation, such review is also plenary.[9] . . .

"When [deciding] a jurisdictional question raised by a pretrial motion to dismiss on the basis of the complaint alone, [a court] must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . .

"In contrast, if the complaint is supplemented by undisputed facts established by [1] affidavits submitted in support of the motion to dismiss . . . [2] other types of undisputed evidence . . . and/or [3] public records of which judicial notice may be taken . . . the trial court,

the state's right not to be required to litigate the claim filed against it would be irretrievably lost"), overruled in part on other grounds by *Miller* v. *Egan*, 265 Conn. 301, 325, 828 A.2d 549 (2003).

[9]"It is axiomatic that our objective in construing statutory language is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . [If] a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Norris* v. *Trumbull*, 187 Conn. App. 201, 209 n.8, 201 A.3d 1137 (2019).

in determining the jurisdictional issue, may consider these supplementary undisputed facts and need not conclusively presume the validity of the allegations of the complaint. . . . Rather, those allegations are tempered by the light shed on them by the [supplementary undisputed facts]. . . . If affidavits and/or other evidence submitted in support of a defendant's motion to dismiss conclusively establish that jurisdiction is lacking, and the plaintiff fails to undermine this conclusion with counteraffidavits . . . or other evidence, the trial court may dismiss the action without further proceedings. . . . If, however, the defendant submits either no proof to rebut the plaintiff's jurisdictional allegations . . . or only evidence that fails to call those allegations into question . . . the plaintiff need not supply counteraffidavits or other evidence to support the complaint, but may rest on the jurisdictional allegations therein.

"Finally, where a jurisdictional determination is dependent on the resolution of a critical factual dispute, it cannot be decided on a motion to dismiss in the absence of an evidentiary hearing to establish jurisdictional facts. . . . Likewise, if the question of jurisdiction is intertwined with the merits of the case, a court cannot resolve the jurisdictional question without a hearing to evaluate those merits. . . . An evidentiary hearing is necessary because a court cannot make a critical factual [jurisdictional] finding based on memoranda and documents submitted by the parties." (Citations omitted; footnote in original; internal quotation marks omitted.) *Norris* v. *Trumbull*, 187 Conn. App. 201, 208–10, 201 A.3d 1137 (2019).

Here, neither party asked the trial court to conduct an evidentiary hearing in order to establish jurisdictional facts, nor do they claim on appeal that an evidentiary hearing was necessary. We therefore limit ourselves, in conducting our de novo review, to the factual record as it existed before the trial court, supplemented by any additional records of which we may take judicial notice. See id., 211.

"[I]n Connecticut, [w]e have long recognized the common-law principle that the state cannot be sued without its consent. . . . The doctrine of sovereign immunity protects the state, not only from ultimate liability for alleged wrongs, but also from being required to litigate whether it is so liable. . . . The protection afforded by this doctrine has been extended to agents of the state acting in its behalf." (Internal quotation marks omitted.) Id.

In *Gordon* v. *H.N.S. Management Co.*, 272 Conn. 81, 861 A.2d 1160 (2004), our Supreme Court established the following analytical framework to employ when deciding whether an entity properly may assert a sovereign immunity defense. "[T]he criteria for determining whether a corporate entity is an arm of the state entitled to assert sovereign immunity as a defense are whether: (1) the state created the entity and expressed an intention in the enabling legislation that the entity be treated as a state agency; (2) the entity was created for a public purpose or to carry out a function integral to state government; (3) the entity is financially dependent on the state; (4) the entity's officers, directors or trustees are state functionaries; (5) the entity is operated by state employees; (6) the state has the right to control the entity; (7) the entity's budget, expenditures and appropriations are closely monitored by the state; and (8) a judgment against the entity would have the same effect as a judgment against the state. To establish that an entity is an arm of the state, an entity need not satisfy every criteria. Rather, [a]ll relevant factors are to be considered cumulatively, with no single factor being essential or conclusive. . . . We recognize that these criteria are somewhat interrelated and overlapping. For example, a determination that an entity is completely financially dependent on the state could lead to an inference that the entity is controlled by the state. Similarly, a determination that the state has the right to control the entity could lend support to a determination that a judgment against the entity would affect the state." (Citation omitted; footnotes omitted; internal quotation marks omitted.) Id., 98–100. This court has held that, "[b]y indicating that an entity 'need

not satisfy every criteria,' the *Gordon* court implicitly placed the burden on the entity attempting to establish its entitlement to sovereign immunity." *Norris* v. *Trumbull*, supra, 187 Conn. App. 214.

Our Supreme Court also has indicated that "[w]hen applying the various factors under *Gordon*, courts must remain cognizant of the rationale underlying the doctrine of sovereign immunity. Although, in the past, we have explained that doctrine in theoretical terms, namely, that there can be no legal right as against the authority that makes the law on which the right depends . . . [t]he modern rationale for the doctrine . . . rests on the more practical ground that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property. . . . Pursuant to this rationale, the doctrine protects the state from unconsented to litigation, as well as unconsented to liability." (Citations omitted; internal quotation marks omitted.) *Rocky Hill* v. *SecureCare Realty, LLC*, 315 Conn. 265, 282, 105 A.3d 857 (2015).

In this case, the trial court rejected the defendant's claim of sovereign immunity solely on the basis of the language in the defendant's enabling legislation that provides that the defendant can "[s]ue and be sued." See General Statutes § 15-31b (a) (4). The plaintiff argues that this language plainly and unambiguously establishes that the defendant is not an arm of the state that is entitled to sovereign immunity. Even if we were to agree that that language is clear and unambiguous,[10] our Supreme Court has held, and we are bound by its holding, that an expressed "intention in the enabling legislation that the [defendant] be treated as a state agency" is only one of eight factors for consideration in determining an entitlement to sovereign immunity. *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 98–100. We therefore are persuaded by the defendant's argument that the

---

[10]We interpret this language later in this opinion.

court should have applied the *Gordon* factors to determine whether it is an arm of the state that is entitled to sovereign immunity.[11] Accordingly, we consider the eight *Gordon* factors as instructed by our Supreme Court and, on the basis of our consideration of those factors, we agree with the trial court's conclusion that the defendant is not entitled to sovereign immunity.[12]

We begin with an examination of the facts and analysis in *Gordon*, in which our Supreme Court held, in two actions seeking uninsured and underinsured motorist benefits, that a private management company, which had contracted with the state to operate certain of its public bus services, shared the state's sovereign immunity. Id., 85, 92. In *Gordon*, the state, pursuant to an expressly articulated legislative policy, essentially had taken over a formerly privately owned bus system, then hired management companies such as the defendant to run that system for the benefit of the public. Id., 85. The defendant was entirely dependent on the state because the state owned all of the assets required to run the system, including the buses, the buildings in which the defendant had its offices and everything in those buildings, and, further, the defendant was required to

[11]The defendant argues, as it did before the trial court, that our Supreme Court's decision in *Connecticut Humane Society* v. *Freedom of Information Commission*, 218 Conn. 757, 591 A.2d 395 (1991), applies when determining whether an entity is an arm of the state that is entitled to sovereign immunity. In *Gordon*, however, our Supreme Court recognized the critical distinction between the inquiry presented in the two cases, stating: "Although we find *Connecticut Humane Society* instructive, we recognize that the considerations underlying a determination as to whether an entity is a public agency for purposes of the [Freedom of Information Act] are not necessarily the same as those underlying a determination as to whether an entity is entitled to assert a sovereign immunity defense." *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 96 n.15. Indeed, as the trial court aptly noted, General Statutes § 1-120 (1) defines the defendant as a quasi-public agency. Although that designation is not in dispute, it does not resolve the issue of the defendant's entitlement to sovereign immunity.

[12]As this court has observed, "[w]e may affirm a trial court's decision that reaches the right result, albeit for the wrong reason." *State* v. *Albert,* 50 Conn. App. 715, 728, 719 A.2d 1183 (1998), aff'd, 252 Conn. 795, 750 A.2d 1037 (2000).

turn all fare revenue over to the state as soon as it was collected. Id., 103. The defendant's operating budget was financed entirely by the state on a month-to-month basis, requiring close monitoring and regular approval, and the state contractually was required to purchase liability insurance for the defendant and to indemnify it for any tort claims on which it became liable. Id., 86, 88. The overall system was subject to oversight through the Department of Transportation, thus rendering "all major issues of policy, planning and operations" within the control of the state. Id., 103. Finally, a judgment against the defendant would have had the same practical effect as a judgment against the state, because the state ultimately would have had to reimburse the defendant for any damages award pursuant to the indemnification requirement, and additionally, it would have had to purchase uninsured/underinsured motorist coverage for its entire fleet of buses. Id., 104. On the basis of the foregoing, the court concluded that five of the eight factors had been satisfied and, on balance, weighed in favor of a conclusion that the defendant was an arm of the state. Id., 102–105. As the following analysis demonstrates, the facts of the present case are far different from those presented in *Gordon*.[13]

As to the first *Gordon* factor, we examine the defendant's enabling legislation to determine whether "the state created the entity and expressed an intention in the enabling legislation that the entity be treated as a state agency . . . ." (Footnote omitted.) Id., 98. This

[13]Despite its insistence that the court should have employed the *Gordon* factors in considering its sovereign immunity claim, the defendant has devoted less than two pages of its appellate brief to its own analysis of those factors. The defendant argues: "First, [the defendant] was created for a public purpose and to carry out a function integral to state government. [General Statutes] §§ 15-31a and 15-31b . . . . Next, there is no dispute that [the defendant] is financially dependent on the state to fulfill its purposes, and that it has received substantial funding from the state for the State Pier Project. . . . The [Construction Manager at Risk] Contract provides that [the defendant] through the State of Connecticut shall seek to obtain funding for the Target Price. . . . Between 2017 and March 2023, the Bond Commission authorized bonds to [the defendant] totaling $237,500,000, of which $180,500,000 was allocated

court has noted that "[t]his criterion essentially has two subparts, namely, (1) whether the defendant was created

to the State Pier Project. . . . Accordingly, the state unquestionably has a vested interest in all of [the defendant's] rights and properties:

"(b) [The defendant] shall continue as long as it has bonds or other obligations outstanding and until its existence is terminated by law, provided no such termination shall affect any outstanding contractual obligation of [the defendant] and *the state shall succeed to the obligations of* [*the defendant*] *under any contract. Upon the termination of the existence of the* [*the defendant*]*, all its rights and properties shall pass to and be vested in the state of Connecticut.* General Statutes § 15-31b [(b)] . . . .

"Consequently, the state closely monitors and oversees [the defendant's] budget, expenditures, and appropriations as evidenced by the several statutory provisions obligating [the defendant] to submit annual and quarterly reports, annual audit reports, budgets, and operating and financial statements to both the governor and the joint standing committee of the General Assembly having cognizance of matters relating to transportation. See . . . General Statutes § 15-31a (k), (*l*) and (o) . . . .

"In addition to its involvement in and oversight of [the defendant's] finances, the state also is involved in [the defendant's] operations, including staffing. . . . As noted earlier, the state provides [the defendant] with assistance for the oversight of design, construction, construction management, and business, legal and procurement services related to the State Pier Project . . . and provided the project manager for the State Pier Project. . . .

"Finally, [the defendant's] directors are state functionaries. The board of directors consists of, inter alia, the state treasurer, the Commissioner of Energy and Environmental Protection, the Commissioner of Transportation, the Secretary of [the Office of Policy and Management], or their designees, one each appointed by the speaker of the House of Representatives, majority leader of the Senate, minority leader of the Senate, majority leader of the House of Representatives, minority leader of the House of Representatives, president pro tempore of the Senate, and seven appointed by the governor. General Statutes § 15-31a (b).

"For all the foregoing reasons, [the defendant] is unquestionably an arm of the state entitled to sovereign immunity under the *Gordon* criteria." (Citations omitted; emphasis in original; internal quotation marks omitted.)

On the basis of the foregoing, the defendant argues that, "at a minimum, six of the eight *Gordon* factors are undeniably satisfied in this case supporting the conclusion that [the defendant] is an arm of the state [that is] entitled to sovereign immunity under these factors." It is unclear from the defendant's argument, however, which of six factors it contends are satisfied.

The previously quoted argument is essentially identical to the argument set forth in the memorandum of law in support of the defendant's motion to dismiss as it pertains to the consideration of the *Gordon* factors.

by legislation and (2) whether such legislation included language indicating that the defendant be treated as a state agency." *Norris* v. *Trumbull*, supra, 187 Conn. App. 215. General Statutes § 15-31a (a) provides: "There is hereby established and created a body politic and corporate, constituting a public instrumentality and political subdivision of the state of Connecticut established and created for the performance of an essential public and governmental function, to be known as the Connecticut Port Authority. The authority shall not be construed to be a department, institution or agency of the state." On the basis of the plain language of § 15-31a (a), it cannot be disputed that the defendant was created by its enactment. For the following reasons, however, we conclude that the enabling legislation is highly suggestive of the legislature's intent that the defendant is not an arm of the state that is entitled to sovereign immunity.

First, the language of the enabling legislation designates the defendant as a "body politic and corporate . . . ." See General Statutes § 15-31b (a) (1). This court construed similar language, "body corporate and politic," in *Norris* v. *Trumbull*, supra, 187 Conn. App. 201, when it considered "whether a regional educational service center established, pursuant to General Statutes § 10-66a et seq., by four or more municipal boards of education [was] entitled to invoke sovereign immunity in a negligence

Moreover, as noted herein, the defendant submitted several documents in support of its motion to dismiss. Those documents comprise approximately 150 pages. In its argument, the defendant cites to certain paragraphs of Hammond's affidavit, which, in turn, refers to only exhibit numbers, without identifying which page of each exhibit supports its argument. Although the defendant's failure to cite the specific pages that support its various arguments has hampered this court's ability to find support for its claims, we nevertheless have thoroughly reviewed the record, including all of the exhibits submitted by the defendant in support of its motion to dismiss. See, e.*g.*, *Begley* v. *State*, 234 Conn. App. 820, 822 n.4, 344 A.3d 982 (2025) ("[a]lthough [i]t is not the role of this court to scour the record in search of support for a party's claim on appeal . . . we nevertheless have carefully reviewed all the evidence submitted to the trial court on summary judgment" (citation omitted; internal quotation marks omitted)), cert. granted on other grounds, 354 Conn. 902, 348 A.3d 813 (2026).

action . . . ." In *Norris,* the court reviewed the enabling statute and concluded, "[r]ather than creating either a state or municipal agency, we construe the legislature's use of the language describing [an entity] as a 'body corporate and politic' as intending to create an independent corporate entity that is separate and distinct from state government." Id., 219. The conclusion that the same interpretation should apply in the present case is bolstered by the language of the defendant's enabling legislation that provides that "[t]he [defendant] shall not be construed to be a department, institution or agency of the state." See General Statutes § 15-31a (a).

The distinction between the defendant and the state or a department or agency of the state is further underscored by documents submitted by the defendant in support of its motion to dismiss. The Memorandum of Understanding to Facilitate the Governance of the Ports and Harbors of the State and the Orderly Transition and Transfer of Related Resources to the Connecticut Port Authority between Connecticut Department of Transportation and Connecticut Port Authority and The Treasurer of the State of Connecticut, signed in June 2016, and the Memorandum of Agreement Regarding Assistance to be Provided by the Office of Policy and Management and the Department of Administrative Services to the Connecticut Port Authority for the Oversight of Design, Construction, Construction Management and Business, Legal and Procurement Services Related to the New London State Pier Project, effective on October 2, 2019, both contain a provision providing that neither the state nor the other state agencies who are parties to those memoranda waive sovereign immunity.[14] Neither

[14] In the Memorandum of Understanding to Facilitate the Governance of the Ports and Harbors of the State and the Orderly Transition and Transfer of Related Resources to the Connecticut Port Authority between Connecticut Department of Transportation and Connecticut Port Authority and The Treasurer of the State of Connecticut (MOU), § 26 provides: "Nothing in this MOU shall be construed as a waiver of the State's or [the Department of Transportation's] sovereign immunity."

In the Memorandum of Agreement Regarding Assistance to be Provided by the Office of Policy and Management and the Department of

of those memoranda mention any immunity with regard to the defendant.

Additionally, § 15-31b (a) (4) provides in relevant part that, "[t]o accomplish the purposes of the [defendant], the [defendant] shall have the duty and power to . . . [s]ue and be sued in its own name, and plead and be impleaded . . . ." As this court pointed out in *Norris*, the language indicating that an entity "can sue or be sued" is "not the type [of language] that the legislature typically would use if it intended that an entity be protected by sovereign immunity, which protects the state not only from liability but from being sued in the first instance." *Norris* v. *Trumbull,* supra, 187 Conn. App. 219. We agree with the *Norris* court that this language supports a conclusion that the entity at issue "would not enjoy sovereign immunity but, instead, would be subject to suit in the same manner as other entities that do not enjoy sovereign immunity."[15] Id. This interpretation finds even more

Administrative Services to the Connecticut Port Authority for the Oversight of Design, Construction, Construction Management and Business, Legal and Procurement Services Related to the New London State Pier Project (MOA), § 26 provides: "Nothing in this MOA shall be construed as a waiver of the State's, [the Office of Policy and Management's] or [the Department of Administrative Services'] sovereign immunity."

[15] The defendant contends that the plaintiff did not argue in opposition to the motion to dismiss that the defendant was not an arm of the state, but, rather, that the "sue or be sued" language should be construed as a waiver to the defendant's sovereign immunity, not as a bar to its existence. This representation is belied by the record. Our review of the plaintiff's opposition to the defendant's motion to dismiss and the transcript of the hearing on the motion reveal that the plaintiff clearly argued that the defendant was not an arm of the state that was entitled to sovereign immunity. In fact, the plaintiff argued that because the defendant is not entitled to sovereign immunity, any argument by the defendant that it did not waive sovereign immunity is "misplaced and otherwise irrelevant to this case."

In *Norris*, this court stated that the trial court in *Norris* had "referred to the 'sue and be sued' language as supporting its conclusion that the defendant was not entitled to invoke sovereign immunity, the court did not base its denial of the motion to dismiss on a finding of waiver. Because we conclude that the defendant is not an entity entitled to the protection of sovereign immunity under the circumstances before us, we do not consider whether sovereign immunity was waived. Instead, we construe this language as evincing an intent that the defendant is

support in the enabling legislation of the defendant in this case, which further provides that the defendant "shall have the duty and power to . . . plead and be impleaded . . . ." See General Statutes § 15-31b (a) (4).

Construing the enabling legislation as a whole, we conclude with respect to the first of the *Gordon* factors that the defendant has not demonstrated that the legislature intended that it be treated as a state agency, but, to the contrary, that the defendant not be treated as such.[16] It is difficult to conjure language that would more definitively establish that an entity is not an arm of the state, short of the language of the enabling legislation of the defendant in this case, disavowing its status as a department or agency of the state. Although the enabling legislation is only one of eight factors for our consideration, we place great weight on the legislative intent evinced by that language.

We turn next to the second factor, which asks whether the defendant "was created for a public purpose or to carry out a function integral to state government . . . ." (Footnote omitted.) *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 98. As quoted previously, the defendant's enabling legislation states that it was "established and created for the performance of an essential public and governmental function . . . ." General Statutes § 15-31a (a). Section 15-31b (a) further provides, inter alia: "The purposes of the [defendant] shall be to coordinate the development of Connecticut's ports and harbors, with a focus on private and public investments, pursue federal and state funds for dredging and other infrastructure improvements to increase cargo movement through the ports and maintain navigability of all ports and harbors, market the economic development of such ports

not to be treated as an agent of the state for all purposes." *Norris* v. *Trumbull*, supra, 187 Conn. App. 219 n.12. The same rationale applies to the present case.

[16]The defendant fails to address this factor, presumably because its consideration undermines rather than bolsters its position. In fact, at oral argument before this court, the defendant conceded that the first *Gordon* factor does not weigh in its favor.

and harbors, work with the Department of Economic and Community Development and other state, local and private entities to maximize the economic potential of the ports and harbors, support and enhance the overall development of the state's maritime commerce and industries, coordinate the planning and funding of capital projects promoting the development of the ports and harbors, develop strategic entrepreneurial initiatives that may be available to the state, coordinate the state's maritime policy activities, serve as the Governor's principal maritime policy advisor and undertake such other responsibilities as may be assigned to it. . . ." The second *Gordon* factor, therefore, favors the defendant.

The third factor to consider is whether the defendant is "financially dependent on the state . . . ." **(**Footnote omitted.**)** *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 98–99. In support of its argument that it is financially dependent on the state, the defendant argues that it "has received substantial funding from the state for the State Pier Project" and points to the specific amounts that it has received for this project. Of course, the fact that an entity receives substantial funding from the state does not necessarily mean that that entity is financially dependent on the state. We generously construe the defendant's argument as an argument that it is financially dependent on the state. In support thereof, the defendant refers to Hammond's affidavit, in which Hammond averred that the General Assembly appropriates $400,000 each year for the defendant in the state's budget and "[t]he State Bond Commission has authorized bonds totaling $237,500,000 to the [defendant] since 2017; of which $180,500,000 has been allocated to the project since 2019."[17] Notably absent from the documents submitted by the defendant, however, is a budget or financial statement of the defendant reflecting a complete picture of the defendant's finances or what

[17]We reiterate that the defendant has not identified the page or pages of the documents that it submitted in support of its motion to dismiss on which it relies in arguing that it is entitled to sovereign immunity.

percentage of its funding comes from the state.[18] In fact, the documents submitted by the defendant, in addition to the defendant's enabling legislation, suggest that the defendant has other sources of funding that would undermine a finding that the defendant is financially *dependent* on the state. For instance, § 15-31b (a) provides that one of the defendant's purposes is to "coordinate the . . . funding of capital projects promoting the development of the ports and harbors . . . ." General Statutes § 15-31b (a). To that end, § 15-31b further provides that the defendant "shall have the duty and power" to, inter alia, adopt its own budget; "[e]nter into joint ventures and invest in, and participate with, any person or entity, including, without limitation, governmental or private business entities in the formation, ownership, management and operation of business entities, including stock and nonstock corporations, limited liability companies and general and limited partnerships, formed to advance the purposes of the [defendant]"; "[r]eceive and accept, from any source, aid or contributions, including money, property, labor and other things of value"; "[i]nvest in, acquire, lease, purchase, own, manage, hold and dispose of real property and lease, convey or deal in or enter into agreements with respect to such property on any terms necessary or incidental to carrying out the purposes of sections 15-31a to 15-31i, inclusive, provided such transactions *shall not be subject to approval, review or regulation by any state agency* pursuant to title 4b or any other provision of the general statutes, except (A) the [defendant] shall not convey fee simple ownership in any property associated with the ports or harbors under its jurisdiction and control without the approval of the State Properties Review Board and the Attorney General, and (B) as provided in subsection (c) of this section . . . ."

---

[18]The defendant submitted its 2022 Annual Operations and Project Report, which lists in its table of contents a section entitled: "Description of the [defendant's] finances, including operating and financial statements." In that section, however, it simply states: "See 'CONNECTICUT PORT AUTHORITY—AUDITED FINANCIAL STATEMENTS—FY2022.'" Those financial statements, however, are not included with the defendant's submission.

(Emphasis added.) General Statutes § 15-31b (a) (8), (10), (11) and (15). The record is devoid of any evidence reflecting the amount of funding that the defendant receives from any of these sources. There is also reference in the defendant's 2022 Annual Operations and Project Report to federal funding associated with the United States Army Corps of Engineers as to one of the defendant's projects. Although the data provided by the defendant reflects that it receives substantial funding from the state, it falls short of establishing that the defendant is financially *dependent* on the state.

We next address the fourth *Gordon* factor, namely, whether the defendant's "officers, directors or trustees are state functionaries . . . ." (Footnote omitted.) *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 99. Because it is undisputed that the defendant's twenty-one member board of directors consists primarily of state functionaries or their designees, this factor weighs in favor of the defendant. See General Statutes § 15-31a (b).[19]

As to the fifth *Gordon* factor, whether the defendant is "operated by state employees"; *Gordon* v. *H.N.S.*

[19]General Statutes § 15-31a (b) provides: "The powers of the [defendant] shall be vested in and exercised by a board of directors, which shall consist of twenty-one voting members as follows: (1) The State Treasurer, or the Treasurer's designee, the Commissioner of Energy and Environmental Protection, or the commissioner's designee, the Commissioner of Transportation, or the commissioner's designee, the Commissioner of Economic and Community Development, or the commissioner's designee, the Secretary of the Office of Policy and Management, or the secretary's designee, the chief elected official of the town of New London, or such official's designee, the chief elected official of the city of New Haven, or such official's designee, and the chief elected official of the city of Bridgeport, or such official's designee, all of whom shall serve ex officio; (2) one appointed by the speaker of the House of Representatives; (3) one appointed by the majority leader of the House of Representatives, who is the chief elected official of a town with a small harbor, or such official's designee; (4) one appointed by the minority leader of the House of Representatives; (5) one appointed by the president pro tempore of the Senate, who is a member or employee of a local port authority; (6) one appointed by the majority leader of the Senate; (7) one appointed by the minority leader of the Senate; and (8) seven appointed by the Governor, one of whom is the chief elected official of a town with a small harbor, or such official's designee. Said members of the

*Management Co.*, supra, 272 Conn. 99; § 15-31b provides, inter alia, that the defendant has the power to employ agents and employees as necessary to fulfill its purposes and "fix appropriate compensation for such employees and establish all necessary or appropriate personnel practices and policies, including those relating to hiring, promotion, compensation, retirement and collective bargaining . . . ."[20] General Statutes § 15-31b (a) (14) (A). This authority seemingly is unfettered by the state. Section 15-31b further provides that the defendant's officers and employees shall be state employees for purposes of "group welfare benefits and retirement." General Statutes § 15-31b (a) (14) (B). Section 15-31b therefore seems to indicate that the defendant is not "operated by state employees" but that its employees

General Assembly and the Governor shall appoint members of the board to succeed appointees whose terms expire and each member so appointed shall hold office for a period of four years from the first day of July in the year of his or her appointment. Appointed members shall include individuals who have experience and expertise in international trade, marine transportation, finance or economic development. The board of directors shall select the chairperson from among the members of the board, who shall serve for a term of two years. The board of directors shall select a vice-chairperson from among its members and such other officers as it deems necessary."

[20]Specifically, General Statutes § 15-31b (a) provides in relevant part that the defendant "shall have the duty and power to . . . (14) Employ such assistants, agents and other employees as may be necessary or desirable to carry out its purposes. (A) The executive director and such employees shall be exempt from the classified service and, except as provided in subparagraph (B) of this subdivision, shall not be employees, as defined in subsection (b) of section 5-270. The [defendant] shall fix appropriate compensation for such employees and establish all necessary or appropriate personnel practices and policies, including those relating to hiring, promotion, compensation, retirement and collective bargaining, which need not be in accordance with chapter 68, and the [defendant] shall not be an employer, as defined in subsection (a) of section 5-270, and may engage consultants, attorneys and appraisers as may be necessary or desirable to carry out its purposes in accordance with sections 15-31a to 15-31i, inclusive. (B) For purposes of group welfare benefits and retirement, including, but not limited to, those provided under chapter 66 and sections 5-257 and 5-259, the officers and all other employees of the [defendant] shall be state employees. The [defendant] shall reimburse the appropriate state agencies for all costs incurred by such designation . . . ."

enjoy certain benefits afforded to state employees. In his affidavit, Hammond averred that certain state employees have provided services to the defendant, the defendant's employees are subject to the state's code of ethics and are assigned state employee identification numbers and are eligible to receive medical and retirement benefits from the state of Connecticut. Hammond's averments fall short of demonstrating that the defendant is "operated by state employees." See *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 99. Indeed, the defendant does not actually argue that it is operated by state employees, but, rather, asserts that the state is "involved" in the defendant's "staffing" and that the state provided the project manager for the project. We cannot conclude, on the basis of the record before us, that the defendant has demonstrated that it is *operated* by state employees.

As to the sixth and seventh *Gordon* factors, we consider whether "the state has the right to control the [defendant]" or whether the defendant's "budget, expenditures and appropriations are closely monitored by the state . . . ." (Footnote omitted.) *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 99–100. The defendant argues that "the state closely monitors and oversees [its] budget, expenditures and appropriations as evidenced by the several statutory provisions obligating [it] to submit annual and quarterly reports, annual audit reports, budgets, and operating and financial statements to both the governor and the joint standing committee of the General Assembly having cognizance of matters relating to transportation."[21] We disagree with the defendant's contention that the requirement that it file annual or

---

[21]In support of this argument, the defendant cites the following sections of General Statutes § 15-31a: "(k) On or before December fifteenth of each year, the board shall report, in accordance with the provisions of section 11-4a, to the Governor and the joint standing committees of the General Assembly having cognizance of matters relating to transportation, commerce and the environment, summarizing the authority's activities, disclosing operating and financial statements and recommending legislation to promote the authority's purposes.

"(*l*) Not later than seven days after receiving an audit of the authority conducted by an independent auditing firm, the board shall submit, in accordance with the provisions of section 11-4a, to the joint standing committees of the General Assembly having cognizance of matters

quarterly reports with the General Assembly constitutes control or close monitoring by the state. Section 15-31b provides, inter alia, that the defendant shall have the duty and power to develop its own organizational and management structure, adopt rules for the conduct of its business, adopt an annual budget and plan of operations, make and enter into contracts and agreements that are necessary to the conduct of its business, enter into joint ventures, invest in or participate with any person or entity in the formation of other business entities and invest in, acquire, lease, purchase, own or enter into agreements with respect to real property with the limitation that it may not convey fee simple ownership of property associated with the ports and harbors without the approval of the State Properties Review Board and the Attorney General.[22] General Statutes § 15-31b

relating to appropriations, commerce, the environment and transportation a copy of each such audit. . . .

"(o) On or before January 1, 2022, and annually thereafter, the board of directors shall submit a report, in accordance with the provisions of section 11-4a, to the Governor and the joint standing committee of the General Assembly having cognizance of matters relating to transportation. Such report shall include, but need not be limited to: (1) A description of the projects undertaken by the authority in the preceding year; (2) a list of projects which, if undertaken by the state, would support the state's maritime policies and encourage maritime commerce and industry; (3) a description of the authority's finances; (4) recommendations for improvements to existing maritime policies, programs and facilities; and (5) recommendations for legislation to promote the authority's purpose."

[22]Specifically, General Statutes § 15-31b (a) provides in relevant part that the defendant "shall have the duty and power to . . . (5) Develop an organizational and management structure that will best accomplish the goals of the authority concerning Connecticut ports and harbors . . .

"(7) Adopt rules for the conduct of its business, which shall not be considered regulations as defined in section 4-166;

"(8) Adopt an annual budget and plan of operations, including a requirement of board approval before the budget or plan may take effect;

"(9) Make and enter into all contracts and agreements that are necessary, desirable or incidental to the conduct of its business, subject to the requirements of section 15-31n and chapter 62;

"(10) Enter into joint ventures and invest in, and participate with, any person or entity, including, without limitation, governmental or private business entities in the formation, ownership, management and operation of business entities, including stock and nonstock corporations,

(a) (5), (7) through (10) and (15). There is nothing in the record before us suggesting that the state has any direct oversight or control over the defendant, its property or its operations other than to conduct an annual audit of

limited liability companies and general and limited partnerships, formed to advance the purposes of the [defendant]. . . .

"(11) Receive and accept, from any source, aid or contributions, including money, property, labor and other things of value;

"(12) Award grants and subsidies, make loans and provide other forms of financial assistance to any person or entity under a written policy, adopted in accordance with the provisions of section 1-121, setting forth the eligibility criteria, application process, and such other provisions as may be necessary or desirable to carry out the purposes of this section;

"(13) Charge reasonable fees for the services it performs and waive, suspend, reduce or otherwise modify such fees in accordance with written criteria established by the authority, and provided, that no change may be made in fees without at least thirty days prior notice, published in accordance with the provisions of section 1-121;

"(14) Employ such assistants, agents and other employees as may be necessary or desirable to carry out its purposes. (A) The executive director and such employees shall be exempt from the classified service and, except as provided in subparagraph (B) of this subdivision, shall not be employees, as defined in subsection (b) of section 5-270. The [defendant] shall fix appropriate compensation for such employees and establish all necessary or appropriate personnel practices and policies, including those relating to hiring, promotion, compensation, retirement and collective bargaining, which need not be in accordance with chapter 68, and the [defendant] shall not be an employer, as defined in subsection (a) of section 5-270, and may engage consultants, attorneys and appraisers as may be necessary or desirable to carry out its purposes in accordance with sections 15-31a to 15-31i, inclusive. (B) For purposes of group welfare benefits and retirement, including, but not limited to, those provided under chapter 66 and sections 5-257 and 5-259, the officers and all other employees of the [defendant] shall be state employees. The [defendant] shall reimburse the appropriate state agencies for all costs incurred by such designation;

"(15) Invest in, acquire, lease, purchase, own, manage, hold and dispose of real property and lease, convey or deal in or enter into agreements with respect to such property on any terms necessary or incidental to carrying out the purposes of sections 15-31a to 15-31i, inclusive, provided such transactions shall not be subject to approval, review or regulation by any state agency pursuant to title 4b or any other provision of the general statutes, except (A) the [defendant] shall not convey fee simple ownership in any property associated with the ports or harbors under its jurisdiction and control without the approval of the State Properties Review Board and the Attorney General, and (B) as provided in subsection (c) of this section; and

finances and evaluation of programs and services.[23] There is no statutory requirement that the defendant's budgets, expenditures, or appropriations be reported to the state for approval or that the state "closely" monitor its day-to-day operations.[24] On the basis of the record before us, we cannot conclude that the defendant has demonstrated that the sixth and seventh factors weigh in favor of a conclusion that it is entitled to sovereign immunity.

Finally, we must consider whether "a judgment against the [defendant] would have the same effect as a judgment against the state." *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 100. In support of its motion to dismiss, the defendant submitted a Memorandum of Understanding to Facilitate the Governance of the Ports and Harbors of the State and the Orderly Transition and Transfer of Related Resources to the Connecticut Port Authority between Connecticut Department of Transportation and Connecticut Port Authority and the Treasurer of the State of Connecticut. That memorandum provides, inter alia, that the defendant shall maintain its own insurance and indemnify, protect, and hold harmless the state and its agents and employees from any and all claims against

"(16) Adopt any policies and procedures necessary to carry out the provisions of this section in accordance with the provisions of section 1-121."

[23]Indeed, the defendant submitted memoranda of understanding pertaining to independent reviews of the defendant's financial and management practices and which direct the Office of Policy and Management to assist in such review and to oversee the defendant's financial decisions until the independent review was completed. These memoranda undermine the contention that the state has routine oversight or control of the defendant.

[24]A Memorandum of Agreement effective on June 1, 2022, entered into by the defendant and the Department of Administrative Services (DAS) "in connection with certain technical services that [the defendant] is requesting from DAS pertaining to [the project]" terminated the October 2019 Memorandum of Agreement pertaining to the administration, procurement and related transaction work for the project because "a lesser level of services from DAS is necessary and desirable during the remaining construction phase of the project, and that all contract administration and management shall be centralized and managed by [the defendant]."

it.[25] Therefore, although a judgment against the state would mean that the state itself would be responsible for paying damages, a judgment against the defendant, in contrast, would not have a direct adverse effect on the state. This eighth criterion thus weighs against concluding that the defendant is an agent of the state.

On the basis of our careful and exhaustive review and consideration of the *Gordon* factors, we conclude that the defendant has failed to meet its burden of establishing that it is an arm of the state that is entitled to sovereign immunity. As we have explained, we are persuaded by the enabling legislation of the defendant that the legislature did not intend for the defendant to be treated as an arm of the state that is entitled to sovereign immunity and our consideration of the remaining *Gordon* factors does not persuade us to the contrary. Accordingly, we conclude that the court properly denied the defendant's motion to dismiss on that ground.

II

The defendant also claims that the court erred by rejecting its argument that the unjust enrichment claim against it was barred by § 49-41 because the plaintiff was protected by the posting of a payment bond.[26] The trial

---

[25]Subsequent memoranda also provide that the defendant shall indemnify and hold harmless the state and its agents from any and all claims against the defendant.

[26]"In general terms, the Little Miller Act, set forth in General Statutes §§ 49-41 through 49-43, provide[s] for the furnishing of bonds guaranteeing payment (payment bonds) on public works construction projects, [and was] enacted to protect workers and materials suppliers on public works projects who cannot avail themselves of otherwise available remedies such as mechanic's liens. . . . Section 49-41 requires that the general contractor provide a payment bond with surety to the state or governmental subdivision, which bond shall guarantee payment to those who supply labor and materials on a public works project. . . . [General Statutes §] 49-42 provides that any person who has performed work or supplied materials on a public works project, but who has not received full payment for such materials or work, may enforce his right to payment under the payment bond." (Internal quotation marks omitted.) *United Concrete Products, Inc.* v. *NJR Construction, LLC*, 207 Conn. App. 551, 572–73, 263 A.3d 823 (2021).

court's rejection of this claim constitutes an interlocutory order because it disposed of neither the plaintiff's entire complaint nor all causes of action in the plaintiff's complaint against the defendant. See Practice Book § 61-2 ("[w]hen judgment has been rendered on an entire complaint . . . such judgment shall constitute a final judgment"); Practice Book § 61-3 ("[a] judgment disposing of only a part of a complaint . . . is a final judgment if that judgment disposes of all causes of action in that complaint . . . brought by or against a particular party or parties").

As noted herein, as a general matter, "the denial of a motion to dismiss is an interlocutory ruling and, therefore, is not a final judgment for purposes of appeal." (Internal quotation marks omitted.) *Conboy* v. *State*, 292 Conn. 642, 645 n.5, 974 A.2d 669 (2009). The denial of a motion to dismiss that raises a colorable claim of sovereign immunity is a final judgment that is immediately reviewable. See *Shay* v. *Rossi*, 253 Conn. 134, 165, 749 A.2d 1147 (2000) ("unless the state is permitted to appeal a trial court's denial of its motion to dismiss, filed on the basis of a colorable claim of sovereign immunity, the state's right not to be required to litigate the claim filed against it would be irretrievably lost"), overruled in part on other grounds by *Miller* v. *Egan*, 265 Conn. 301, 325, 828 A.2d 549 (2003). Because we agree, however, with the trial court's conclusion that the defendant has failed to raise a colorable claim of sovereign immunity, we dismiss this claim for lack of a final judgment.

The appeal is dismissed as to the defendant's claim that the plaintiff's action is barred by § 49-41; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.